**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VICTORIA TCHOUKHROVA, DMITRI
TCHOUKHROVA, and EVGUENI
TCHOUKHROVA,

          *Petitioners,*

      v.

ALBERTO R. GONZALES,* Attorney
General,

          *Respondent.*

No. 03-71129

Agency Nos.
A75-772-599
A75-772-600
A75-772-601

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
September 1, 2004—Pasadena, California

Filed April 21, 2005

Before: Stephen Reinhardt, A. Wallace Tashima, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Reinhardt

---

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

## COUNSEL

Jonathan D. Montag, Law Offices of Jonathan D. Montag, San Diego, California, for the petitioner.

Peter D. Keisler, Assistant Attorney General, Civil Division; Margaret J. Perry, Senior Litigation Counsel; William C. Erb, Jr. and Frances M. McLaughlin, U.S. Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for respondent.

## OPINION

REINHARDT, Circuit Judge:

The question before us is whether under our immigration laws asylum may be granted to the parents of a disabled child who has been persecuted in his native land on account of his disability or whether, instead, we are compelled to force the family to return involuntarily to its home country where the child is likely to face further persistent and debilitating persecution. To answer that question, we must decide (1) whether disabled children and their parents who provide care for them may constitute a particular social group within the meaning of our immigration laws and (2) whether, in order to protect a disabled child from persecution, a parent of such child may apply for asylum and withholding of removal and may rely

during the administrative proceeding on the past persecutory conduct directed against the child.

We hold that disabled children and their parents constitute a statutorily protected group and that a parent who provides care for a disabled child may seek asylum and withholding of removal on the basis of the persecution the child has suffered on account of his disability. We also hold that, given the record before us, the parent who is seeking asylum and withholding in this case is eligible for the former relief and entitled to the latter. Finally, we hold that the parent's spouse and the disabled child are eligible for asylum by virtue of their derivative applications and are also entitled to withholding of removal.

## I.   FACTUAL AND PROCEDURAL HISTORY

Evgueni Tchoukhrova was born in 1991 in Vladivostok, Russia with infantile cerebral paralysis, or cerebral palsy. His disability resulted chiefly from the negligence of members of the staff of the Russian state-owned hospital, who first induced his mother's labor and then abandoned her for the entire night, during which time the fetus did not receive sufficient oxygen. The next morning, because the induced labor had stopped, hospital personnel decided to forcibly extract the child from its mother's body, breaking its neck in the process. Instead of giving the newborn child medical care, they initially threw Evgueni into a container holding abortion and other medical waste, telling his mother that "they didn't see the reason why he needed to live." The mother, Victoria Tchoukhrova, having lost a lot of blood, fell into a state of unconsciousness.

Against all odds and despite the staff's neglect, Evgueni survived, and was retrieved from the disposal bin. As soon as she became conscious again, Victoria commenced pleading to see her son, without success. She was told that he was severely disabled and that she should "refuse" him. After five

days, Victoria managed to convince a nurse to break the rules and let her visit her child in the middle of the night because she "wanted desperately to see him and to hold his lifeless body close to [her] heart."

Despite Victoria and her husband Dmitri's attachment to their newborn son, government officials tried to intimidate the couple into abandoning him to a state-run orphanage. Notwithstanding his parents' refusal to give their consent, Evgueni was transferred to an institution for orphaned children with birth defects. Victoria and Dmitri repeatedly sought to visit their son, but were denied permission for the first two months.

When the Tchoukhrovas finally gained entrance to the "hospital" for children with birth defects, the conditions were horrifying. The children were wrapped in old, wet, dirty linens and cried out from hunger. No one cleaned or otherwise took care of them. Some children writhed in pain but received no treatment. Despite their cries and obvious plight, the "children were simply abandoned." The Tchoukhrovas would not allow their child to remain in confinement under such deplorable conditions and, notwithstanding intense pressure from state authorities to consent to Evgueni's permanent institutionalization, Victoria and Dmitri secured his release and put him in a private clinic.

Evgueni's parents' struggles had still not ended. Once Evgueni was diagnosed as having infantile cerebral palsy, he was permanently labeled as disabled and was consequently banned from receiving any public medical support for his condition. In search of better medical care for their child, the family traveled three times to the Osteopathic Center for Children in San Diego. As a result of the treatment that he received in the United States, Evgueni was able to walk for the first time in his life. When the family returned to Russia, Victoria and Dmitri, in accordance with the recommendation of his American doctor, refused to allow Evgueni to be vacci-

nated. The doctor was concerned about the boy's fragile immune system. Because Evgueni was not vaccinated, it became difficult for him to obtain *any* medical care in state-run medical facilities.

The diagnosis of cerebral palsy resulted in Evgueni's being denied access to public school, despite the fact that his disability was a physical and not a mental one.[1] The Russian government doctor recommended that, if Evgueni's parents insisted on refusing to allow him to be institutionalized, he "be isolated at home" and not taken out into public places, a recommendation that was understandable given the extreme degree of societal prejudice against the disabled in Russia. When Victoria took Evgueni out in public, he was subjected to verbal abuse and spat upon. Victoria would often hear parents say to their children: "Get away from that boy, can't you see that he's abnormal" or "Don't get near him, he's sick." Children would throw things at him. Although many of the interactions were simply frightening and humiliating, two assaults resulted in Evgueni's hospitalization. On one visit to a park when he was six years old, several young men attacked him. The broken arm and severe head trauma that he suffered due to this incident required him to be hospitalized for two months and led to insomnia, spontaneous crying, shaking, and paranoia. Victoria and Dmitri filed a report with the police, but they never investigated the incident. On another occasion, a women yelled at Victoria, "Get your ugly imbecile out of here," and shoved Evgueni to the ground. He was rushed to the emergency room and received several stitches in his head, from which he still has a visible scar. Victoria again filed a police report; this time, the police told her the case was insignificant and to settle it herself. Evgueni became so frightened

---

[1]In fact, Evgueni has been described by his current doctor as "an intelligent vital child who is determined to overcome his limitations." Since coming to the United States, Evgueni has learned English, has made friends, and is thriving at his elementary school where he is being educated in regular public school classes.

of the dangers he faced every time he went outside that he refused to leave the house. All the while, the government continued to try to have him institutionalized.

Unable to get the government to treat their son with decency or even to attempt to protect him from the violent harassment he faced, Victoria and Dmitri decided to take political action in order to create a normal life for him. They joined together with other parents of disabled children and founded an association "that opposed the prevailing oppressive conditions of the handicap [sic] children," called "Mothers Unite!" Victoria worked to have a newspaper article published criticizing the Russian government's treatment of disabled children, but the proposed article was canceled at the last minute. The couple spoke to the authorities, wrote letters demanding equal rights, and engaged in fundraising on behalf of the cause. The family also sought help from the Moon Society; this action only provoked additional harassment. After one meeting, people threw stones at Victoria and vandalized the family's car. When Dmitri complained to the police, the authorities failed to respond. In 1997, Dmitri was fired from his job as a civil engineer and was unable to find employment for two years. In several job interviews, he was urged to stop advocating for the rights of the disabled. With hostilities toward the whole family increasing and the mounting certainty that Victoria and Dmitri would never be able adequately to protect their son and provide him with a life free from persecution, the family left for the United States in 2000.

Documentary evidence corroborates Victoria's testimony. The wretched treatment Evgueni received from both the Russian government and from private individuals in Russia is far from uncommon in that country. For example, the 2000 State Department Human Rights Report ("State Department Report") confirms that Evgueni's treatment as a child with cerebral palsy reflects the standard practice. Russia institutionalizes its "orphans," more than 90% of whom are so-

called "social orphans"—children who have at least one living parent but who, like Evgueni, are so-classified by the state because they have been deemed undesirable in some respect. The State Department Report states:

> [T]he prospects of children/orphans who are disabled physically or mentally are extremely bleak. The label of "imbecile" or idiot, which signifies "uneducable," is almost always irrevocable. The most likely future is a lifetime in state institutions.

The Report also explains that, once institutionalized, children are often "provided for poorly" and are in some cases "abused physically by staff." The State Department Report also incorporates the 1998 Human Rights Watch Report "Abandoned to the State," which chronicles the "shocking levels of cruelty and neglect" in the state institutions, called "*internaty*," where children with cerebral palsy and other disabilities are "warehoused":

> In addition to receiving little or no education in such *internaty*, these orphans may be restrained in cloth sacks, tethered by a limb to furniture, denied stimulation, and sometimes left to die half-naked in their own filth. Bedridden children aged five to seventeen are confined to understaffed lying-down rooms . . . and in some cases are neglected to the point of death.

According to the Human Rights Watch Report, "severely disabled babies are routinely abandoned at state-run maternity wards, under pressure from medical personnel who warn the recuperating mothers of a life as social pariahs if they keep a 'defective' child." All children who have been institutionalized face the danger of being diagnosed as " '*oligophrenic*,' or mentally retarded" even when they have no mental impairments. As explained in the report, those with "diagnoses of *oligophrenia* have extreme difficulty seeking a re-assessment of their status," and "[t]hose who grow to adulthood are then

interned in another 'total institution,' where they are permanently denied opportunities to know and enjoy their civil and political rights." Even the children who manage to be classified as "normal" while institutionalized face grim prospects because they "lack the necessary social, educational, and vocational skills to function in society."

Unfortunately, what is true for social orphans in Russia extends to disabled people generally in that country. As the State Department Report explains, the disabled face the danger of being "removed from mainstream society and isolated in state institution[s]"; they face "immense problems" created by the government and societal prejudice.

The Tchoukhrovas entered the United States on September 9, 2000 and shortly thereafter applied for asylum, withholding, and relief under the Convention Against Torture. Victoria filed the principal application for asylum and listed both Dmitri and Evgueni; she stated that she wished to include them in her application. In an oral decision, the immigration judge made explicit findings that (1) Victoria's testimony was credible, (2) the family were members of a particular social group, namely, "a family whose child is severely disabled," (3) the harms suffered by the Tchoukhrovas were on account of their membership in that particular social group, (4) the government of Russia was responsible for the harms because "the government of Russia wishes to isolate handicapped children," (5) "Russian society does not tolerate people with disabilities," and (6) the family did suffer harm in Russia. However, while saying the case was close and that he hoped that the family would be able to stay in the United States, the immigration judge held that the harms the family suffered did not rise to the level of persecution. He therefore denied Victoria's application for asylum, withholding, and a prohibition against removal under the Convention Against Torture.[2] The

---

[2]The Tchoukhrovas have since abandoned their Convention Against Torture claim. Furthermore, although the family requested voluntary departure at their hearing and although the immigration judge never ruled on that request, the Tchoukhrovas do not appeal that issue.

BIA issued a summary, although not streamlined, decision in which it noted that the Tchoukhrovas had a "very sympathetic family history," but, nevertheless, adopted the immigration judge's decision and denied the relief sought. This petition for review followed.

## II.   STANDARD OF REVIEW

We accept the petitioner's testimony as true when, as here, the agency finds her to be credible. *Mihalev v. Ashcroft*, 388 F.3d 722, 724 (9th Cir. 2004). To establish eligibility for asylum, the petitioner must prove that she is unable or unwilling to return to her home country because of a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42)(A); *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 (1987). An asylum applicant can establish eligibility either "because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution." 8 C.F.R. § 1208.13(b) (2005). The applicant is entitled to withholding if she has suffered a past threat to life or freedom or is more likely than not to endure a future threat to life or freedom. 8 C.F.R. § 1206.16(b) (2005).

When the BIA adopts the immigration judge's decision as its own, we treat the immigration judge's reasons as the BIA's. *He v. Ashcroft*, 328 F.3d 593, 595-96 (9th Cir. 2003). Here, the BIA relied on *Matter of Burbano*, 20 I. & N. Dec. 872, 874 (BIA 1994), which holds that "the Board's final decision may be rendered in a summary fashion," and that, in such cases "the Board's conclusions upon review of the record coincide with those which the immigration judge articulated in his or her decision." When the BIA does not express any disagreement with any part of the immigration judge's decision, but instead cites *Burbano*, the BIA adopts his decision in its entirety.

## III. ANALYSIS

Because the immigration judge explicitly reached all of the component issues in the family's asylum and withholding claims, we review each of those determinations here, and, if relief is warranted, we are authorized to order that such remedy or remedies be granted.[3] We agree with the legal conclusion of the immigration judge and the BIA that disabled children and their parents who provide care for them are members of "a particular social group." We also agree that the factual findings that Evgueni and his parents were members of that social group, were harmed (directly or indirectly) on account of their membership, and that these harms were inflicted by the Russian government or those whom it was unwilling or unable to control are supported by substantial evidence. Furthermore, although we agree that, as a matter of law, the immigration judge was correct to look at the harms faced by the Tchoukhrovas collectively when evaluating Victoria's application, we hold that his determination that the harms did not rise to the level of persecution is not supported by substantial evidence.

### A. On Account Of A Particular Social Group

[1] The first question we must consider is whether disabled children and their parents who provide care for them constitute a particular social group within the meaning of 8 U.S.C. § 1101(a)(42)(A). Whether a category constitutes "a particular

---

[3]Contrary to the government's argument, *INS v. Ventura*, 537 U.S. 12 (2002) (per curiam) does not require us to remand cases to the BIA when an immigration judge has decided an issue of first impression and the BIA issues a *Burbano* affirmance adopting the IJ's opinion in a summary fashion, as the BIA has, by virtue of the *Burbano* affirmance, already ruled on the issue in question. We note that a *Burbano* affirmance is different from a streamlined affirmance which signifies only "that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial." 8 C.F.R. § 1003.1(a)(7)(ii); *Chen v. Ashcroft*, 378 F.3d 1081, 1087 n.2 (9th Cir. 2004).

social group" for the purposes of asylum and withholding of removal is a legal question we review de novo. *Hernandez-Montiel* v. *INS*, 225 F.3d 1084, 1091 (9th Cir. 2000). A "particular social group" is one in which the members are "united by a voluntary association, including a former association, *or* by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it." *Id.* at 1093. We agree with the agency that Russian disabled children and their parents constitute a "particular social group."

**[2]** We begin by noting that persons with disabilities are precisely the kind of individuals that our asylum law contemplates by the words "members of a particular social group." While not all disabilities are "innate" or "inherent," in the sense that they may be acquired, they are usually, unfortunately, "immutable." *Id.* at 1087, 1093; *see also* Americans with Disabilities Act of 1990, Pub. L. No. 101-336 § 2(a)(7) *codified at* 42 U.S.C. § 12101(a)(7) ("[I]ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness . . . based on characteristics that are beyond the control of such individuals . . . ."). Because disability constitutes precisely the sort of "immutable characteristic" that an individual "cannot change," as contemplated by our law, we have no trouble concluding that persons with disabilities can constitute a "particular social group" for purposes of asylum and withholding of removal law.

As the above analysis suggests, we include within the social group only persons whose disabilities are serious and long-lasting or permanent in nature. We need not decide whether such persons necessarily constitute a social group in every country, although it is clear from our references to the Americans with Disabilities Act that in this land they do. For purposes of this case, we need determine only two narrow questions. First, do disabled children in Russia constitute a

particular social group? And, second, may their parents be joined with them in that classification? We answer both questions affirmatively.

**[3]** Disabled children in Russia constitute a distinct and identifiable group. In this respect, disabled Russian children resemble the particular social groups our circuit has previously recognized. *See, e.g.*, *Mohamed v. Gonzales*, 400 F.3d 785, 796-98 (9th Cir. 2005) (holding that a Somali woman under threat of female genital mutilation was a member of a particular social group); *Karouni v. Gonzales*, 399 F.3d 1163, 1172 (9th Cir. 2005) (holding that "*all* alien homosexuals are members of a 'particular social group' "). Disabled children in Russia share not only common characteristics but a common experience as well. Their mistreatment by the state and society in general is well-documented before us, by explicit discussion in both the State Department Report and a Human Rights Watch Report devoted to the issue. Russian children who are disabled experience permanent and stigmatizing labeling, lifetime institutional *internaty*, denial of education and medical care, and constant, serious, and often violent harassment. All of this evidence supports our conclusion that in Russia disabled children constitute a particular social group.

**[4]** We further hold that Russian parents who provide care for their disabled children are properly included in the particular social group. Parents who resist the harms inflicted by the Russian government upon their children often express a political opinion while doing so, and thus may be entitled to asylum on that basis as well.[4] But, in providing care for their disabled children, parents are doing something more fundamental than engaging in politics: They are acting out of love and devotion for their children. Helping care for one's dis-

---

[4]Indeed, Victoria and Dmitri pursued political means to redress their son's mistreatment—forming a political group, raising funds, meeting with political leaders, and writing letters.

abled child is an act basic to one's humanity. Parents who provide such care act in a manner that is "so fundamental" to their identities that they "should not be required to change." *Hernandez-Montiel*, 225 F.3d at 1093; *see also Matter of Acosta,* 19 I. & N. Dec. 211, 233 (BIA 1985)*, overruled in part on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). Likewise, just as their children's disabilities are "immutable," so is a parent's relationship to a disabled child. Because the parents and their disabled child incur the harm as a unit, it is appropriate to combine family members into a single social group for purposes of asylum and withholding. Furthermore, including parents in the social group with their disabled children is consistent with the definition of a "particular social group" that we sometimes employ, namely, "a collection of people closely affiliated with each other, who are actuated by some common impulse or interest." *Sanchez-Trujillo v. INS*, 801 F.2d 1511, 1576 (9th Cir. 1986). The family interest in preserving the rights and protecting the welfare of a disabled child welds the parents (or those in *loco parentis*) together with the disabled child in a manner that qualifies all of them as members of a social group for purposes of our immigration laws.

We therefore come to the same legal conclusion as the agency and hold that Russian disabled children and their parents who help care for them constitute a social group for purposes of our immigration statutes. *See* 8 U.S.C. §1101(a)(42)(A). If individuals experience persecution on account of their membership in that group, they may seek asylum and withholding of removal.

In addition to the legal questions, we also consider the immigration judge's factual determinations that (1) the Tchoukhrovas were members of this particular social group, (2) the harms that they experienced were on account of their membership in the social group, and (3) the harms that occurred were inflicted by the government or those whom the government was unwilling or unable to control. In this case,

none of these factual determinations is disputed. Uncontroverted evidence supports the findings that Evgueni suffers from cerebral palsy and is classified as disabled by the Russian government, that Victoria and Dmitri have dedicated their lives to caring for their son, and that the Tchoukhrova family was therefore part of the "social group" of disabled Russian children and their parents. Furthermore, it is undisputed that the government's cruel mistreatment of Evgueni and the violence to which he was subjected by private parties were both on account of his membership in that group and that the government not only inflicted harm directly but was unwilling or unable to control the persecutory conduct of the private parties involved. Accordingly, the requirements for finding "persecution" under the statute are all met, except for the question whether the harmful and injurious conduct to which Evgueni was subjected rose to the level of persecution.

## B.   Rising To The Level Of Persecution

### 1.   Preliminary Question

Before addressing the final issue, we must decide a threshold procedural question: May the harms suffered by a disabled child be taken into account when determining whether to grant his parent's asylum application? Once again, we agree with the approach taken by the agency in this case. Without discussing the question expressly, the agency treated the harms inflicted on the family members cumulatively. Both the purposes of our immigration statutes and the background principles of law generally applicable to families and children mandate the procedure followed by the agency in this case.

[5] Immigration law has always had a purpose of protecting families and, where possible, keeping them united. *See, e.g.*, *Solis-Espinoza v. Gonzales*, ___ F.3d ___ (9th Cir. 2005) ("The Immigration and Nationality Act ("INA") was intended to keep families together. It should be construed in favor of family units and the acceptance of responsibility by family

members."). It has also always been a principle of American law that the family is a unique and important social unit entitled to legal protection. *See Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) ("Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (emphasizing the "important" and "essential" nature of the family and holding that "integrity of the family unit" is constitutionally protected); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000) (rejecting any notion that a "child is the mere creature of the State") (internal citations omitted). Caring for the family is also consistent with our international obligations. *See, e.g.*, International Covenant on Civil and Political Rights, art. 23, opened for signature, Dec. 16, 1966, 999 U.N.T.S. 171, 6 I.L.M. 368, 375 (ratified by the United States on September 5, 1992) ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State."). Imputing the disabled child's harms to the parent filing an application for asylum on behalf of the family members vindicates these basic principles and statutory purposes, and renders the law consonant with both common sense and the important family values on which this nation prides itself. The agency was correct, as a matter of law, to do so here.

**[6]** The procedural issue arises as a consequence of the limited scope of derivative asylum applications. Under 8 U.S.C. § 1158(b)(3), only a spouse or child of an alien may obtain asylum eligibility derivatively when the petitioning alien's application is approved. Although the statute provides that minor children may obtain asylum derivatively through their parents, there is no comparable provision permitting parents to obtain that relief derivatively through their minor children. Accordingly, if a minor child is granted asylum as a derivative applicant of his parent's principal application, both parents and child can stay in the United States. However, if the child is the principal applicant and is granted asylum, the

child can legally stay in this country, but his parents will be removed. This second circumstance occurs rarely because parents fleeing to this country usually have their own claims of persecution, and it is infrequent that the child is the only member of the family who has been directly persecuted in the family's native country. *See generally* Jeff Weiss, U.S. Dep't. of Justice, Guidelines for Children's Asylum Claims, *at* 1998 WL 34032561 (1998) ("The majority of children who apply for asylum do so riding along with a parent's ('principal') application."). However, when it is only the child who is the direct victim, a narrow interpretation of our asylum laws could have devastating practical effects: Facing imminent removal, parents could be forced to make a choice between abandoning their child in the United States or taking him to a country where it is likely that he will be persecuted.

In the case of disabled children, this dilemma is exacerbated. Although all children are dependent and vulnerable, disabled children are particularly so. Children with disabilities have unique needs, their treatment frequently requires specialized knowledge, and their care often involves heightened levels of compassion and patience that parents are particularly suited, and motivated, to give. *See Parham v. J. R.*, 442 U.S. 584, 618 (1979) ("For a ward of the state, there may well be no adult who knows him thoroughly and who cares for him deeply[,] [u]nlike with natural parents where there is a presumed natural affection to guide their action . . . ."). Furthermore, because children with disabilities still face considerable discrimination, even in a country such as our own, they require more protection than children who are not confronted with such prejudices. Therefore, if we were to interpret the law as requiring persecuted disabled children to apply for asylum on their own as principal applicants, while barring their parents from applying for asylum on their behalf or on the basis of the persecution that the children have experienced or fear, the consequences would be particularly disastrous. Disabled children would be able to live either in a country free from persecution or with a care-giving parent, but not both.

This interpretation would result in affording relief to persecuted disabled children in name only. Fortunately, our law is not so cruel as to require that result.

[7] Our precedent supports the pragmatic approach applied here by the agency. When confronting cases involving persecution of multiple family members, we have not formalistically divided the claims between "principal" and "derivative" applicants but instead, without discussion, have simply viewed the family as a whole. *See, e.g.*, *Kaiser v. Ashcroft*, 390 F.3d 653, 660 (9th Cir. 2004) ("Because Kaiser and his family have a well-founded fear of persecution in Pakistan . . . we grant the petition with respect to Petitioners' asylum claim and remand to the BIA."); *Maini v. INS*, 212 F.3d 1167, 1177 (9th Cir. 2000) ("Accordingly, we hold that the Mainis are 'statutorily eligible for asylum.' "); *Singh v. INS*, 94 F.3d 1353, 1360 (9th Cir. 1996) ("[W]e conclude that Singh and his family are eligible for asylum based on the past persecution they suffered in Fiji."); *Prasad v. INS*, 47 F.3d 336, 339 (9th Cir. 1995) (discussing the "family's application"). Following that practice here, we hold that a parent of a disabled child may file as a principal applicant in order to prevent the child's forced return to the family's home country and may establish her asylum claim on the basis of the persecution inflicted on or feared by the child.

## 2. *Extent Of Past Harm*

[8] Although we have agreed with the agency's adjudication of this case thus far, we conclude that it erred in finding that the injurious conduct to which Evgueni and his parents were subjected did not rise to the level of persecution. Substantial evidence does not support that finding. To the contrary, the record compels the conclusion that the harm suffered by the Tchoukhrovas constituted persecution within the meaning of 8 U.S.C. § 1101(a)(42).

Throughout Evgueni's life, he has suffered greatly at the hands of others. Below, we explain the four kinds of injurious

conduct to which he has been subjected. Although most of these harms could rise to the level of persecution independently, there is no doubt that, when taken together, they constitute persecution. *Guo v. Ashcroft*, 361 F.3d 1194, 1203 (9th Cir. 2004) (explaining how the court "look[s] at the totality of the circumstances in deciding whether a finding of persecution is compelled").

[9] The first form of injury inflicted on Evgueni occurred in the hospital at the time of his birth. Although the breaking of his neck was likely a result of gross negligence, the subsequent attempted disposal of the newborn child as medical waste because he was "damaged" was unquestionably intentional. The immigration judge failed to discuss this incident when deciding that the treatment to which Evgueni was subjected did not constitute persecution. Although there are no precedents on point—most likely because few living individuals have been discarded along with aborted fetuses and survived—we have no doubt that being treated as waste and thrown into a pile of human remains, when done on account of a protected ground, rises to the level of persecution.

[10] The second form of injury Evgueni suffered was his involuntary confinement in an "*internaty*." Aside from any pain or suffering associated with the conditions of the confinement, children, like adults, have a right to be free. The deprivation of freedom can constitute persecution and can form the basis of eligibility for asylum or entitlement to withholding. *See, e.g.*, 8 C.F.R. § 1208.13; 8 C.F.R. § 1208.16 (an alien may be entitled to withholding of removal when his "life or freedom" would be threatened on account of a protected ground). It is true that "we have held that some circumstances that cause petitioners physical discomfort or loss of liberty do not qualify as persecution." *Mihalev*, 388 F.3d at 729. Here, however, Evgueni was confined against his parents' will for two months as a child. He was not a danger to society. Nor was it necessary that the state provide care for him. (Indeed, the state gave him virtually no care during his institutionaliza-

tion.) Evgueni deserved to be free. *See Parham*, 442 U.S. at 600 (holding that disabled children have "a substantial liberty interest in not being confined unnecessarily").

**[11]** The fact of Evgueni's unnecessary, involuntary, and unjustified confinement might alone be sufficient to warrant a finding of persecution. Given the horrifying conditions of his confinement, however, any reasonable factfinder would be compelled to conclude that in his case the confinement rose to that level. At Evgueni's "*internaty*," the children were wrapped in wet, soiled linens and abandoned in cold rooms to spend their days alone without human contact, much less affection. No one cleaned them and they were rarely and inadequately fed. They did not receive medical treatment, even those who were in great pain from the injuries they suffered. Their frequent screams elicited no response from the institution's staff. Evgueni spent his first two months of life in these shameful conditions and is lucky to have survived.

Under our precedent, involuntary detentions under harsh conditions can constitute persecution. *See Ndom v. Ashcroft*, 384 F.3d 743, 752 (9th Cir. 2004) (holding that two detentions, for a total of 25 days, in "dark, crowded cells without formal charges," "shackled in cuffs that prevented him from straightening his legs," and "forced to urinate in his clothes" along with threats constituted persecution); *Kalubi v. Ashcroft*, 364 F.3d 1134, 1136 (9th Cir. 2004) (noting that immigration judge found that imprisonment in a "over-crowded jail cell with harsh, unsanitary and life-threatening conditions" established persecution). That Evgueni was subjected to such harsh conditions at a tender age strengthens his claim. The time he spent suffering, without any stimulus or love, were two developmentally crucial months of his life. *See Parham*, 442 U.S at 627-28 (Brennan, J. concurring in part and dissenting in part) (explaining how institutional confinement has more severe consequences on children than adults and that "childhood is a particularly vulnerable time of life and children erroneously institutionalized during their formative years

may bear the scars for the rest of their lives"). Furthermore, the fact that Evgueni's treatment was standard practice for the Russian government and not directed at him personally does not lessen the nature of the harm he experienced. In fact, "the more serious and widespread the threat of persecution to the group," the easier it is for an applicant to prove a well-founded fear of persecution. *Mgoian v. INS*, 184 F.3d 1029, 1035 n.4 (9th Cir. 1999). Finally, while we do not assume that the Russian government had Evgueni's best interests at heart when it institutionalized him—indeed, the evidence supports the opposite conclusion—the lack of malicious intent on the part of the persecutor is irrelevant to this aspect of our inquiry. *See, e.g.*, *Pitcherskaia v. INS*, 118 F.3d 641, 648 (9th Cir. 1997) ("The fact that a persecutor believes the harm he is inflicting is 'good for' his victim does not make it any less painful to the victim, or, indeed, remove the conduct from the statutory definition of persecution. . . . Human rights laws cannot be sidestepped by simply couching actions that torture mentally or physically in benevolent terms such as 'curing' or 'treating' the victims."); *In re Kasinga*, 21 I. & N. Dec. 357, 365 (BIA 1996) (holding that " 'punitive' or 'malignant' intent is not required for harm to constitute persecution"). Thus, Evgueni's confinement under the conditions that existed in his *internaty* constituted significant persecutory conduct.

The third form of harm Evgueni suffered was continuing discrimination by the Russian government following his release from confinement. Because he was officially labeled as disabled by the Russian government, Evgueni was denied rights afforded to all other citizens. One right that was significantly circumscribed was access to medical care. Specifically, Evgueni was never given any treatment for his cerebral palsy and had difficulty obtaining routine medical care afforded to other Russians as a matter of course. He was also denied the benefits of another right—the right to an elementary education. While Evgueni is an intelligent and thriving young boy, the disability label the government attached to him served to

bar him from attending public schools. The immigration judge excused the Russian government's treatment of Evgueni because Russia "does not have the resources to provide medical attention to individuals at the same standards as in developed nations." He applied the same reasoning to the state's refusal to provide Evgueni with an elementary or other education. However, that reasoning was erroneous.

It is true generally that a country's failure to provide its citizens with a particular level of medical care or education due to economic constraints is not persecution. *See Raffington v. INS*, 340 F.3d 720, 723 (8th Cir. 2003). However, claims of financial difficulties cannot be used to justify the deprivation of services essential to human survival and development, if the deprivation is based on the recipient's membership in a statutorily protected group. The government's refusal to provide medical care and an elementary education to "disabled children" solely because they are members of the particular social group the term describes cannot be excused on the basis of the need to limit expenditures. If medical or education resources are to be limited, the allocation of funds must be based on other, less invidious, grounds. Although denying medical care or education on the basis of race, ethnicity, religion, political opinion, or membership in a particular social group is, at a minimum, discrimination, where the denial seriously jeopardizes the health or welfare of the affected individuals, a finding of persecution is warranted.

**[12]** Furthermore, Evgueni remains under constant threat that he will be returned to an *internaty* by the Russian government, as Russia confines both disabled children and adults in "total institutions." In these institutions, the inmates are denied all their civil and political rights and kept in inhumane circumstances. While Evgueni's parents have been successful so far in preventing the government from re-institutionalizing him, if the government were to prevail in its efforts, Evgueni would be subjected to a lifetime of suffering. The continuing threat of that confinement, when considered along with the

continuing denial of a public education and of medical care for the condition that plagues Evgueni, provides strong support for the claim of persecution.

**[13]** The fourth form of harm from which Evgueni suffered is violence on the part of individual citizens. When considering whether the adverse treatment to which Evgueni was subjected rose to the level of persecution, the immigration judge failed even to mention this factor, and completely ignored the two assaults on Evgueni that caused him serious bodily injury. In doing so, the immigration judge committed error. The two incidents were serious indeed; in both instances Evgueni required medical attention and as a result of one of them he was hospitalized for a two month period. *See, e.g.*, *Chand v. INS*, 222 F.3d 1066, 1073-74 (9th Cir. 2000) ("Physical harm has consistently been treated as persecution."); *Duarte de Guinac v. INS*, 179 F.3d 1156, 1161 (9th Cir. 1999) ("[W]e have consistently found persecution where, as here, the petitioner was physically harmed . . . ."). The Tchoukhrovas reported these and other incidents to the authorities, who refused even to investigate them. As the Russian government was "unwilling or unable" to control the conduct of those who assault the disabled, the Tchoukhrovas are entitled to seek asylum and withholding of removal on that basis. *Malty v. Ashcroft*, 381 F.3d 942, 948 (9th Cir. 2004); *see also Avetova-Elisseva v. INS*, 213 F.3d 1192, 1198 (9th Cir. 2000) (holding that the fact that "financial considerations may account for" Russia's inability to prevent persecution "does not matter").

**[14]** Taken as a whole, the harm to which Evgueni was subjected unquestionably rose to the level of persecution. Because this persecution is properly considered when adjudicating his mother's claim, we hold that Victoria has suffered past persecution, and note that the same would be true whichever parent was the principal applicant.

## 3. *Well-Founded Fear*

**[15]** Because Victoria suffered past persecution, she is entitled to a presumption of a well-founded fear of future persecu-

tion. 8 C.F.R. § 1208.13(b)(1). Here the immigration judge did not apply the presumption and therefore did not consider whether the INS met its rebuttal burden. In such cases, we often remand for the agency to resolve, in the first instance, the question of a "fundamental change in circumstances" or that there is the possibility of relocation—the two ways the INS could demonstrate that the Tchoukhrovas no longer have a well-founded fear—in the first instance. *See Ventura*, 537 U.S. at 14, 17-18; *Lopez v. Ashcroft*, 366 F.3d 799, 806-07 (9th Cir. 2004). However, when the INS makes no argument before the immigration judge or the BIA concerning changed conditions, we do not remand. *See Ndom*, 384 F.3d at 756; *Baballah v. Ashcroft*, 367 F.3d 1067, 1078 n.11 (9th Cir. 2004). Here, the INS made no argument to the agency—or to us—that there has been a fundamental change in circumstances or a possibility of relocation. Moreover, no evidence regarding improvement in the conditions facing the disabled in Russia appears in the record. To the contrary, the record clearly shows that Russia continues to treat its disabled population, and particularly its disabled children, cruelly and inhumanely. Under these circumstances, the presumption has not been, and cannot be, rebutted. Thus, Victoria has established a well founded fear of persecution. Accordingly, she is statutorily eligible for asylum, and we remand for the Attorney General to exercise his discretion. If Victoria is granted asylum, Dmitri and Evgueni may obtain relief through their derivative applications.

**[16]** Because it is more likely than not that Evgueni would face future persecution if he were returned to Russia, Victoria is also entitled to withholding of removal, 8 C.F.R. § 1208.16(b)(1), as are Dmitri and Evgueni. The agency erred in failing to grant this relief. *See, e.g.*, *Qu v. Gonzales*, 399 F.3d 1195, 1203 (9th Cir. 2005); *Agbuya v. INS*, 241 F.3d 1224, 1231 (9th Cir. 2001) (as amended). Accordingly, we also remand for the grant of withholding of removal.

**GRANTED** and **REMANDED** for further proceedings consistent with this opinion.