**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

VICTORIA TCHOUKHROVA; DMITRI
TCHOUKHROV; EVGUENI
TCHOUKHROV,

              *Petitioners,*

       v.

ALBERTO R. GONZALES, Attorney
General; TOM RIDGE, Secretary of
Homeland Security,

              *Respondents.*

No. 03-71129

Agency Nos.
A75-772-599
A75-772-600
A75-772-601

ORDER

Filed December 5, 2005

Before: Stephen Reinhardt, A. Wallace Tashima, and
Kim McLane Wardlaw, Circuit Judges.

Order;
Dissent by Judge Kozinski

---

## ORDER

The panel has voted to deny the petition for panel rehearing and petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration. FED. R. APP. P. 35.

The petition for rehearing en banc is DENIED.

---

15623

KOZINSKI, Circuit Judge, with whom Judges O'SCANNLAIN, TALLMAN, RAWLINSON, BYBEE, CALLAHAN and BEA join, dissenting from denial of rehearing en banc:

This case presents a question of exceptional importance with profound implications for our nation's immigration laws. The panel permits an applicant to claim asylum based on the harms suffered by her child. *See Tchoukhrova* v. *Gonzales*, 404 F.3d 1181, 1190 (9th Cir. 2005) ("[T]he harms suffered by a disabled child [may] be taken into account when determining whether to grant his parent's asylum application."). By allowing the harms suffered by a child to be imputed to the parent, the panel in effect creates a reverse derivative asylum claim—something expressly barred by 8 C.F.R. § 207.7(b)(6), which provides that "[t]he following relatives of refugees are *ineligible* for accompanying or following-to-join benefits . . . [a] *parent*, sister, brother, grandparent, grandchild, nephew, niece, uncle, aunt, cousin or in-law." *Id.* (emphasis added).

This exotic reading of the immigration statute was never discussed by the IJ, the BIA or even the parties—rather, it is something the panel comes up with on its own. Whatever the merits of such an approach, the panel concedes that neither the IJ nor the BIA "discuss[ed] the question expressly." *Tchoukhrova*, 404 F.3d at 1190. It strains credulity to suggest that the IJ and the BIA would have adopted such a sweeping change to the interpretation of the immigration statute without thinking long and hard about what they were doing. In *INS* v. *Ventura*, 537 U.S. 12, 15-17 (2002) (per curiam) (summary reversal), the Supreme Court told us in no uncertain terms that the agency charged with administering the statute gets first crack at ruling on its construction. It has taken us less than three years to work our way around this rule.

The facts of the case are, indeed, sad and compelling. Evgueni Tchoukhrov was born in 1991 in Vladivostok, Rus-

sia, with cerebral palsy. He was treated badly in his first two months of life. Although his parents, Victoria and Dmitri, tried to provide for him, they encountered hostility from neighbors and indifference from the Russian government. Their government doctor recommended that Evgueni be institutionalized, or at the very least "isolated at home." Evgueni also suffered other injuries that the government failed to correct or investigate. *Tchoukhrova*, 404 F.3d at 1184-85.[1]

As a result of the government's indifference and hostility, Evgueni's parents joined with others and sought to raise public awareness of the plight of disabled children in Russia. The Tchoukhrovs endured minor harassment and their car was vandalized. Later, Dmitri was fired from his job and told during subsequent job interviews that he should stop advocating for rights for the disabled. *Tchoukhrova*, 404 F.3d at 1186.

Victoria filed an application for asylum and withholding of removal, and listed both Evgueni and Dmitri as derivative applicants. *Id.* at 1187; *see also* 8 U.S.C. § 1158(b)(3)(A) (spouse and children of principal applicant may be granted asylum if accompanying, or following to join, principal appli-

---

[1]The government disputes key parts of the panel's factual summary, noting that the panel accepts as true certain allegations not presented at the hearing and that the IJ had no opportunity to adjudicate. For example, the government argues that the panel's finding that Evgueni was treated as "medical waste," *id.* at 1184, was not part of the IJ's findings and is an unexhausted claim on which the panel engages in original factfinding, *see* Respondent's Petition for Rehearing En Banc at 9 & n.3. The government also disputes the panel's finding that Evgueni was placed in an "internaty" during his first few months of life. *See Tchoukhrova*, 404 F.3d at 1193. ("[A]n internaty is an orphanage for abandoned orphans from 5 to 17 years old who have been diagnosed as uneducable because of severe mental impairment." Respondent's Petition for Rehearing En Banc at 10 n.4 (internal quotation marks omitted).) As the government points out in its Petition for Rehearing En Banc, the IJ found, and Victoria testified, that Evgueni was placed in a hospital, not an internaty. *Id.* (citing Certified Administrative Record at 56, 95). Because the facts included by the panel have no bearing on my dissent, I accept the panel's factual recitation.

cant). The IJ found Victoria's testimony credible and deter-
mined that her family belonged to a particular social group,
"namely, 'a family whose child is severely disabled.' "
*Tchoukhrova*, 404 F.3d at 1187. The IJ also found that the
harms suffered by the family were on account of their mem-
bership in that group and that the government of Russia was
responsible for the harms the group suffered because "Russia
wishes to isolate handicapped children." *Id.* However, the IJ
found that the harms suffered by the social group did not
amount to persecution. *See* Certified Administrative Record at
61. The BIA, in a summary ruling, adopted the IJ's decision
and denied relief, citing *Matter of Burbano*, 20 I. & N. Dec.
872 (BIA 1994), "which holds that 'the Board's final decision
may be rendered in a summary fashion,' and that, in such
cases 'the Board's conclusions upon review of the record
coincide with those which the immigration judge articulated
in his or her decision.' " *Tchoukhrova*, 404 F.3d at 1188
(quoting *Burbano*, 20 I. & N. Dec. at 874).

The panel overrules the BIA and rejects its finding of no
past persecution of the social group, holding that the finding
was not supported by substantial evidence. *See id.* But finding
that a *group* was persecuted doesn't mean that every member
of the group was persecuted. Rather, once an asylum peti-
tioner has shown that he is a member of a persecuted group,
he must still show that he himself has suffered or is likely to
suffer persecution. *See, e.g.*, *Hoxha* v. *Ashcroft*, 319 F.3d
1179, 1182 (9th Cir. 2003) (holding that "[asylee's] fear must
be based on an individualized rather than generalized risk of
persecution"); *Avetova-Elisseva* v. *INS*, 213 F.3d 1192, 1201
(9th Cir. 2000) (finding a well-founded fear of future persecu-
tion based on "a singling out of the petitioner so that an estab-
lished current pattern of persecution of members of the group
to which she belongs carries the personalized threat of *her*
future persecution").

After finding that the Tchoukhrovs were members of a per-
secuted group, therefore, the panel was required to consider

whether the asylum petitioner—here, Victoria—had herself suffered persecution. Instead of focusing on the harms suffered by Victoria, the panel holds that "the harms inflicted on the family members [must be treated] cumulatively," and thus "the harms suffered by a disabled child [may] be taken into account when determining whether to grant his parent's asylum application." *Tchoukhrova*, 404 F.3d at 1190. Although the panel admits that the agency never expressly discussed the issue, *id.*, the panel goes on to decide that "a parent of a disabled child may file as a principal applicant in order to prevent the child's forced return to the family's home country and may establish her asylum claim on the basis of the persecution inflicted on or feared by the child," *id.* at 1192.

Asylum claims are normally individual petitions, i.e., for the benefit of the petitioner. *See, e.g.*, 8 U.S.C. § 1158(a)(2)(D) ("An application for asylum of *an alien* may be considered . . . if *the alien* demonstrates . . . the existence of changed circumstances which materially affect *the applicant's* eligibility for asylum . . . .") (emphasis added). The asylum statute does permit the filing of a derivative claim, that is, a claim based on another person's eligibility, in narrowly delimited circumstances: Derivative asylum claims may be filed on behalf of an eligible petitioner's spouse and children. *See id.* § 1158(b)(3). However, the regulations governing the admission of refugees expressly provide that "[t]he following relatives of refugees are *ineligible* for accompanying or following-to-join benefits . . . [a] *parent*, sister, brother, grandparent, grandchild, nephew, niece, uncle, aunt, cousin or in-law." 8 C.F.R. § 207.7(b)(6) (emphasis added). The regulatory scheme unmistakably provides than an asylum seeker may include his spouse and children as derivative applicants, but may not include his parents or other relatives.

Here, the harms suffered directly by Victoria are clearly not enough to amount to persecution; it is only the harms suffered by Evgueni that could possibly support an asylum claim. But Evgueni is not the principal applicant; even if he were, he

could not confer derivative status on his parents. The panel recognizes this, noting that "if the child is the principal applicant and is granted asylum, the child can legally stay in this country, but his parents will be removed." *Tchoukhrova*, 404 F.3d at 1191. The panel avoids this harsh result by inventing a doctrine of persecution renvoi: It holds that Victoria may file as the principal applicant and use the harms suffered by Evgueni to support *her* persecution claim, and thus enable Evgueni to file as a derivative applicant. *See id.* at 1192. The panel thus permits persecution suffered by a child to be considered in support of his mother's persecution claim, which then permits the child (i.e., the only one who has actually suffered persecution) to be treated as a derivative applicant for asylum on the mother's application (even if the mother has personally suffered no persecution).

This reading of the immigration statute is, to put it mildly, strained. Congress adopted section 1158(b)(3) to provide for asylum for a clearly limited class of family members of those who were persecuted. The statute is quite specific that only the spouse and children of a principal applicant are entitled to derivative status. *See* 8 U.S.C. § 1158(b)(3). Parents are expressly not. *See* 8 C.F.R. § 207.7(b)(6). By assessing harms cumulatively, the panel moots this carefully drawn statutory scheme, and obviates the need for derivative status in the first place. Under the panel's reasoning, section 1158(b)(3) becomes mere surplusage, since the spouse and children of the principal applicant will *themselves* file as principal applicants once familial harms are assessed "cumulatively." This is all very new law.[2]

---

[2]We have held that it may be appropriate to consider the harm suffered by family members in evaluating whether the principal applicant suffered persecution. For example, persecution suffered by one's relatives may corroborate an applicant's claim that he himself was persecuted. *See, e.g.*, *Mashiri* v. *Ashcroft*, 383 F.3d 1112, 1120-21 (9th Cir. 2004); *Baballah* v. *Ashcroft*, 367 F.3d 1067, 1074-75 (9th Cir. 2004); *Salazar-Paucar* v. *INS*, 281 F.3d 1069, 1071, 1075 (9th Cir.), *amended by*, 290 F.3d 964 (9th Cir.

Even if this interpretation might ultimately prevail, the BIA is entitled under *Chevron* to consider it in the first instance. *See Chevron U.S.A. Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984). The panel claims that the agency, in fact, has already done this, but it is clear from the record that the agency did nothing of the sort. The panel maintains that the agency effected this sea-change in our

---

2002). Or, the government might target the children of its enemies as a means of persecuting their parents. *Cf. Thomas* v. *Gonzales*, 409 F.3d 1177, 1184, 1189 (9th Cir. 2005) (en banc) (holding that the targeting of family members "on account of their shared, immutable characteristic, namely, their familial relationship," may constitute persecution). But that is quite different from what we have here.

The harm suffered by Evgueni is *not* evidence that Victoria suffered similar harm. That Evgueni may have received inadequate medical care for his cerebral palsy says nothing about the quality of medical care that Victoria—an able-bodied adult—has received or will receive in Russia. Nor does the fact that strangers may have taunted Evgueni for being disabled help prove that Victoria will be similarly taunted. Nor is there any allegation that the government targeted Evgueni in a byzantine plot to punish Victoria. Rather, the panel holds that the mere fact that Evgueni suffered harm is—without more—sufficient to impute that harm to Victoria for purposes of considering her asylum application. That is a quantum leap that our cases do not support and the statute prohibits.

Cases involving forced sterilization are likewise inapposite because "forced sterilization is a unique kind of persecution" that inflicts a similar harm—depriving the family of any chance to procreate—on the husband. *Qu* v. *Gonzales*, 399 F.3d 1195, 1202-03 (9th Cir. 2005); *see also In re Y-T-L-*, 23 I. & N. Dec. 601, 607 (BIA 2003) ("Coerced sterilization is better viewed as a permanent and continuing act of persecution that has deprived *a couple* of the natural fruits of conjugal life, and the society and comfort of the child or children that might eventually have been born to them." (emphasis added)). Whereas sterilizing a wife in effect sterilizes her husband, providing Evgueni with inadequate medical care did not in any way affect his mother's health. *Qu* and *Y-T-L-* did not involve derivative claims or the imputing of harm from one member of a family to another. Rather, the claims for withholding of removal in *Qu* and *Y-T-L-* were based on the fact that each petitioner had, in effect, been sterilized by the authorities' mistreatment of his wife. Unlike here, the harm to the petitioners in *Qu* and *Y-T-L-* was direct, not derivative.

immigration laws "[w]ithout discussing the question express-
ly," *Tchoukhrova*, 404 F.3d at 1190, pointing to a stray phrase
in the IJ's oral decision, which it rips out of context and then
claims was adopted chapter and verse by the BIA. Both steps
in its analysis are fatally flawed.

As to the IJ, it is clear that he treated the harms to the fam-
ily cumulatively only for purposes of determining whether the
social group in question—here, the family of a disabled child
—was persecuted. In making that determination, it was of
course necessary to consider the harms suffered by the group
cumulatively—just as one would consider the harms suffered
by all Sikhs in a part of India in determining whether Sikhs
as a group are subject to persecution.

Cumulating all the harms suffered by the Tchoukhrovs, the
IJ found that the group had suffered no persecution. *See* Certi-
fied Administrative Record at 61. Having made that determi-
nation, the IJ had no reason to go on to the next step and
figure out whether individuals in the group had been perse-
cuted. His next statement that "there has been no proof that
either the respondent, her husband, or her child, suffered past
persecution on account of any of the grounds stated in the
asylum statute," *id.*, thus could not, as a matter of either law
or logic, have been a finding as to individual harms; rather,
it was a restatement of his determination that the social group
had not suffered persecution because none of its members had
been persecuted. Restatements or summaries are common in
oral rulings, and it does the IJ an injustice to take his words
wholly out of context and attribute to them a meaning he
could not possibly have intended.

Nor, of course, did the BIA "adopt" the IJ's supposed
determination that, in assessing individual harms, persecution
of one family member may be attributed to all others, and vice
versa. Petitioner advanced no such theory before the BIA, and
thus the BIA, in a case in which the IJ had found *no* group
persecution, had no occasion to consider what the IJ might

have said about how individual harms are to be assessed. In affirming the IJ under *Burbano*, the BIA did nothing more than agree with the IJ that no group persecution had been established. But a *Burbano* affirmance signals only that the BIA has adopted the IJ's decision with respect to those issues adequately raised on appeal; it does not equate to an acceptance of the IJ's entire decision when only parts of that decision are appealed. *See Mabugat* v. *INS*, 937 F.2d 426, 430 (9th Cir. 1991) (dismissing arguments petitioner failed to raise before the BIA). The BIA could not have imagined that by summarily affirming the IJ's denial of relief, it was actually cutting a large hole in the fabric of our immigration laws.

As the government warns in its Petition for Rehearing En Banc, the panel's opinion has far-reaching implications, and the issues raised therein are likely to reoccur with increasing frequency. *See, e.g.*, *Abay* v. *Ashcroft*, 368 F.3d 634, 641-42 (6th Cir. 2004) (granting asylum to mother "based on her fear that her daughter will be subjected to" female circumcision); *Oforji* v. *Ashcroft*, 354 F.3d 609, 618 (7th Cir. 2003) (holding in female circumcision case that "an alien parent who has no legal standing to remain in the United States may not establish a derivative claim for asylum by pointing to potential hardship to the alien's United States citizen child in the event of the alien's deportation"). Despite the panel's best efforts to muddy the waters, the fact is, the IJ and the BIA did nothing like what the panel attributes to them; they'd surely be shocked at the suggestion that they did. *Ventura* requires a remand so the agency can, in the first instance, rule on the inventive arguments adopted by the panel, arguments that were neither raised below nor by any of the parties on appeal. Because this decision is nothing but a big end-run around *Ventura*, we should have taken the case en banc and repaired the damage ourselves.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO
———————

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2005 Thomson/West.