In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3197

FRANCIS GATIMI, *et al.*,

*Petitioners*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition to Review an Order of the
Board of Immigration Appeals.
Nos. A96-495-092, A96-495-093, A96-495-094

ARGUED APRIL 7, 2009—DECIDED AUGUST 20, 2009

Before POSNER, RIPPLE, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The Board of Immigration Appeals denied the asylum application of Francis Gatimi, a Kenyan, and the applications of his wife and daughter, which are derivative from his. The Board also denied a motion to remand the matter to the immigration judge for further consideration based on changed conditions in Kenya since the original application for asylum, but we have no jurisdiction to review that order: 8 U.S.C.

§ 1158(a)(3) bars judicial review of rulings by the Board
that there are no changed circumstances materially af-
fecting an application for asylum. See *Khan v. Filip*,
554 F.3d 681, 687 (7th Cir. 2009). And 8 U.S.C.
§ 1252(a)(2)(B)(ii), as interpreted in *Kucana v. Mukasey*,
533 F.3d 534, 536-37 (7th Cir. 2008), cert. granted, 129
S. Ct. 2075 (2009), bars judicial review of discretionary
decisions of the Board, thus including motions to recon-
sider, see 8 C.F.R. §§ 1003.2(a), (b)(1), which was the
nature of Gatimi's motion to remand.

Gatimi is a member of the Kikuyu tribe, which
dominates Kenyan politics. In 1995 he joined a Kikuyu
group called the Mungiki (the Kikuyu word for "multi-
tude"). The group has obscure political aims and idio-
syncratic religious observances, which may be a cover
for extortion and other financially motivated criminal
acts. United Nations Human Rights Council, "Report of
the Special Rapporteur on extrajudicial, summary
or arbitrary executions, Philip Alston, Addendum,
Mission to Kenya" ¶ 8 (A/HRC/11/2/Add.6,
May 26, 2009), www2.ohchr.org/english/bodies/hrcouncil/
docs/11session/A.HRC.11.2.Add.6.pdf (visited July 20,
2009—as were all the online sources cited in this opinion);
U.S. Dep't of State, Bureau of Democracy, Human Rights,
and Labor, "2008 Human Rights Report: Kenya" (Feb. 25,
2009), www.state.gov/g/drl/rls/hrrpt/2008/af/119007.htm.

The group is much given to violence. *In re D-I-M-*, 24 I. &
N. Dec. 448, 448-49 (BIA 2008); United Nations Human
Rights Council, "Statement by Professor Philip Alston,
Special Rapporteur on extrajudicial, summary or arbitrary

executions," (June 3, 2009), www.un.org/webcast/unhrc/ 11th/statements/Alston_STMT.pdf; Hearing on the Immediate and Underlying Causes and Consequences of Kenya's Flawed Election before the Senate Committee on Foreign Relations, Subcommittee on African Affairs, 110th Cong., 2d Sess. (Feb 7, 2008) (testimony of Chris Albin-Lackey on behalf of Human Rights Watch), foreign.senate.gov/ testimony/2008/AlbinLackeyTestimony080207a.pdf. Defectors from the group are at particular risk of violence. Immigration and Refugee Board of Canada, "Kenya: The *Mungiki* Sect; Leadership, Membership and Recruitment, Organizational Structure, Activities and State Protection Available to Its Victims (2006-October 2007)" (Nov. 1, 2007), www.unhcr.org/refworld/docid/4784def81e.html; Cyrus Kinyungu, "Murdered: Sect Members Who Said No," *The Nation (Nairobi)*, June 19, 2004.

The group also compels women, including wives of members and of defectors, to undergo clitoridectomy and excision. The Kenyan government has outlawed the group and these practices. But there is a serious question, as the sources we have cited explain, whether it is able or even willing to protect people targeted by the group, such as defectors, or to prevent such practices, which are common in Kenya as in much of sub-Saharan Africa. U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, "2008 Human Rights Report: Kenya" (Feb. 25, 2009), www.state.gov/g/drl/rls/hrrpt/2008/af/119007.htm; U.S. Dep't of State, Office of the Senior Coordinator for International Women's Issues, "Report on Female Genital Mutilation" 7, 9, 38-39 (Feb. 1, 2001), www.state.gov/ documents/organization/9424.pdf.

Mr. Gatimi defected from the Mungiki in 1999, and shortly afterward a group of Mungiki broke into his home, looking for him, and when they could not find him killed his servant. He called the police, but they refused to help or protect him. A month later the Mungiki returned to his home, looking for his wife, whom they wanted to circumcise. They did not find her. She then fled to the United States with her newborn child.

The Mungiki returned to Gatimi's home, killed the family pets, burned two vehicles, and threatened to gouge out his eyes. Again he complained to the police, and this time they assured him they would protect him. On the strength of this assurance his wife came back to Kenya—but within a week the Mungiki told Gatimi that unless he produced his wife within two weeks for circumcision he would be killed. She went into hiding and in 2001 returned to the United States, followed shortly by Gatimi.

He returned to Kenya a few months later, having heard that conditions had improved. He was wrong. The Mungiki kidnapped and tortured him, releasing him only after he promised to produce his wife for circumcision. He left Kenya and joined his wife in the United States and applied for asylum.

The immigration judge ruled that the acts committed by the Mungiki against Gatimi were not persecution but merely "mistreatment." That is absurd. With regard to Mrs. Gatimi's claim to face persecution in the form of female genital mutilation, a recognized ground of asylum, the immigration judge lapsed into incoherence. The fol-

lowing is his entire discussion of the claim: "As far as the female respondent's claim that she is afraid to [return to] Kenya because of fear of female genital mutilation, while that contention may be sincerely subjectively expressed, I don't find that as toward country conditions; that is, it has an objective basis." He also ruled that Gatimi had not shown that the Kenyan police were helpless to protect him from the Mungiki, and that in any event defectors from the Mungiki do not constitute a "particular social group."

The Board did not reach the question whether Gatimi had been persecuted, but affirmed the immigration judge on the basis that defectors from the Mungiki are not a particular social group and that as far as Mrs. Gatimi's fear of female circumcision was concerned Gatimi had "failed to present sufficient testimonial or documentary evidence to establish that a reasonable person would fear persecution in Kenya on this basis."

Persecution is a ground for asylum only if motivated by "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The immigration statute does not define "particular social group," but the Board has defined it as a group whose members share "common characteristics that members of the group either cannot change, or should not be required to change because such characteristics are fundamental to their individual identities." *In re Kasinga*, 21 I. & N. Dec. 357, 365-66 (BIA 1996); see also *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998); *In re Acosta*, 19 I. & N. Dec. 211, 233-34 (BIA 1985), over-

ruled on other grounds by *In re Magharrabi*, 19 I. & N. Dec. 439 (BIA 1987). So far, so good; if the "members" have no common characteristics they can't constitute a group, and if they can change those characteristics—that is, cease to belong to the group—without significant hardship, they should be required to do so rather than be allowed to resettle in America if they do not meet the ordinary criteria for immigration to this country.

*Sepulveda v. Gonzales*, 464 F.3d 770, 771-72 (7th Cir. 2006) (citations omitted), gives examples of qualifying groups: "the educated, landowning class of cattle farmers targeted by Colombian rebels, Christian women in Iran who oppose the Islamic dress code for women, parents of Burmese student dissidents, and children who escaped after being enslaved from Ugandan guerillas who had enslaved them." *Sepulveda* holds that former subordinates of the attorney general of Colombia who had information about the insurgents plaguing that nation were also a "particular social group." They had been targeted for assassination by the insurgents, and many had been assassinated. While an employee could resign from the attorney general's office, he could not resign from a group defined as *former* employees of the office; once a former employee, always a former employee (unless one is reemployed by one's former employer). See also *Koudriachova v. Gonzales*, 490 F.3d 255, 262-63 (2d Cir. 2007) (former KGB agents); *Cruz-Navarro v. INS*, 232 F.3d 1024, 1029 (9th Cir. 2000) (former members of the police or military); *In re Fuentes*, 19 I. & N. Dec. 658, 662 (BIA 1988) (former member of the national police).

We cannot see how this case can be distinguished from *Sepulveda*, which the Board did not cite. Instead the Board cited cases which hold that a group must have "social visibility" to be a "particular social group," meaning that "members of a society perceive those with the characteristic in question as members of a social group." The Board said there was no evidence that Gatimi "possesses any characteristics that would cause others in Kenyan society to recognize him as a former member of Mungiki . . . . There is no showing that membership in a larger body of persons resistant to Mungiki is of concern to anyone in Kenya or that such individuals are seen as a segment of the population in any meaningful respect."

This formula cannot be squared with *Sepulveda*. More important, it makes no sense; nor has the Board attempted, in this or any other case, to explain the reasoning behind the criterion of social visibility. Women who have not yet undergone female genital mutilation in tribes that practice it do not look different from anyone else. A homosexual in a homophobic society will pass as heterosexual. If you are a member of a group that has been targeted for assassination or torture or some other mode of persecution, you will take pains to avoid being socially visible; and to the extent that the members of the target group are successful in remaining invisible, they will not be "seen" by other people in the society "as a segment of the population." Those former employees of the Colombian attorney general tried hard, one can be sure, to become invisible and, so far as appears, were unknown to Colombian society as a whole.

We are mindful of the Supreme Court's admonition to the courts of appeals, in *Gonzales v. Thomas*, 547 U.S. 183 (2006) (per curiam), that the Board's definition of "particular social group" is entitled to deference. The issue in that case was whether a family could be a particular social group, a difficult issue on which the Board had not opined; and the Court held that the Board should have an opportunity to do so. But regarding "social visibility" as a criterion for determining "particular social group," the Board has been inconsistent rather than silent. It has found groups to be "particular social groups" without reference to social visibility, *In re Kasinga*, *supra*, 21 I. & N. Dec. at 365-66 (young women of a tribe that practices female genital mutilation but who have not been subjected to it); *In re Toboso-Alfonso*, 20 I. & N. Dec. 819, 822-23 (BIA 1990) (homosexuals); *In re Fuentes*, *supra*, 19 I. & N. Dec. at 662 (former members of the national police); cf. *In re Acosta*, *supra*, 19 I. & N. Dec. at 233-34 (former military leaders or land owners), as well as, in this and other cases, refusing to classify socially invisible groups as particular social groups but without repudiating the other line of cases. When an administrative agency's decisions are inconsistent, a court cannot pick one of the inconsistent lines and defer to that one, unless only one is within the scope of the agency's discretion to interpret the statutes it enforces or to make policy as Congress's delegate. *AT & T Inc. v. FCC*, 452 F.3d 830, 839 (D.C. Cir. 2006); *Idaho Power Co. v. FERC*, 312 F.3d 454, 461-62 (D.C. Cir. 2002). Such picking and choosing would condone arbitrariness and usurp the agency's responsibilities.

It is true that our sister circuits have generally approved "social visibility" as a criterion for determining whether an asylum seeker was persecuted for belonging to a particular social group. We have no quarrel with the rejection in those cases of the attempted classification of specific groups as particular social groups. See *Ramos-Lopez v. Holder*, 563 F.3d 855, 859-61 (9th Cir. 2009) (young Honduran men who resist being recruited into gangs); *Scatambuli v. Holder*, 558 F.3d 53, 58 (1st Cir. 2009) (Brazilians who inform on drug smugglers); *Davila-Mejia v. Mukasey*, 531 F.3d 624, 628-29 (8th Cir. 2008) (competing Guatemalan owners of family businesses); *Ucelo-Gomez v. Mukasey*, 509 F.3d 70, 72-73 (2d Cir. 2007) (per curiam) (affluent Guatemalans); *Castillo-Arias v. United States Attorney General*, 446 F.3d 1190, 1194-95, 1197 (11th Cir. 2006) (informants on the Colombian drug cartel). We just don't see what work "social visibility" does; the candidate groups flunked the basic "social group" test, quoted earlier, declared in cases like *Lwin*, *Kasinga*, and *Acosta* (where the test originated).

The Board's position in this case, however, is of a piece with another position that we have rejected: that a person cannot complain of religious persecution if by concealing his religious practice he escapes the persecutors' notice. *Oyekunle v. Gonzales*, 498 F.3d 715, 717 (7th Cir. 2007); *Iao v. Gonzales*, 400 F.3d 530, 532 (7th Cir. 2005); *Muhur v. Ashcroft*, 355 F.3d 958, 960-61 (7th Cir. 2004). The only way, on the Board's view, that the Mungiki defectors can qualify as members of a particular social group is by pinning a target to their backs with the legend "I am a Mungiki defector." The government's brief states flatly

that secrecy disqualifies a group from being deemed a particular social group.

The Board has a legitimate interest in resisting efforts to classify people who are targets of persecution as members of a particular social group when they have little or nothing in common beyond being targets. One example is a group defined as the set of people who cooperate with the police and by doing so expose themselves to persecution by the criminals whom they have informed on, as in the *Scatambuli* and *Castillo-Arias* cases cited earlier. Another example is debtors of the same creditor, as in *Cruz Funez v. Gonzales*, 406 F.3d 1187, 1191-92 (10th Cir. 2005). But like the lawyers in the *Sepulveda* case, the defectors from the Mungiki constitute a group with as much coherence as children of the bourgeoisie, or of the aristocracy, had in the Soviet Union: breakaway factions that were relentlessly persecuted.

A further question, however, is whether the Kenyan government is either complicit in the Mungiki's persecution of defectors from the group or helpless to protect them from the Mungiki. If neither is the case, Mr. Gatimi is not entitled to asylum. But if the government either is complicit in the persecution by the private group or simply can't protect a former member of the group from being persecuted—in other words—if the government is "unable or unwilling to protect him against the private parties," *Garcia v. Gonzales*, 500 F.3d 615, 618 (7th Cir. 2007)—then the claim to asylum can go forward. *Youkhana v. Gonzales*, 460 F.3d 927, 932 (7th Cir. 2006); *Hor v. Gonzales*, 421 F.3d 497, 502 (7th Cir.

2005); *Korablina v. INS*, 158 F.3d 1038, 1044-45 (9th Cir. 1998).

The evidence of the Kenyan government's complicity in the actions of the Mungiki is compelling, yet was ignored by the Board. See Juma Kwayera, "Gang Infiltrates Kenya Police," *Mail & Guardian Online*, Feb. 5, 2008 ("growing fears" that the Kenyan police force has been "infiltrated by the outlawed pro-government Mungiki sect"); David McGuffin, "Kenya Spirals into Tribal Anar-chy," *CBC News*, Jan. 31, 2008; "Ethnic Violence Intensifies in Ravaged Kenya," *TV3*, Jan. 31, 2008 ("Mungiki is the unofficial arm of the government"); Thilo Thielke, "Some Kill with Machetes, Others with Arrows," *Spiegel Online*, Jan. 28, 2008 (the Mungiki are "acting in collusion with the government"); Immigration and Refugee Board of Canada, *supra*. The Board's ruling that defectors from the Mungiki do not constitute a partic-ular social group made this evidence irrelevant.

We turn to Mrs. Gatimi's claim. The Board's lawyer, going beyond anything in either the immigration judge's opinion or the Board's opinion, argues that because Mrs. Gatimi's claim of asylum is derivative from her husband's, and because she did not file a claim for asylum within the one-year statutory deadline, 8 U.S.C. § 1158(a)(2)(B), the only basis on which she can obtain asylum is persecution of her husband. But there are two senses in which one person's claim of asylum can be derivative from another's. The first, and much the more common, is that the person is a spouse or child of the primary asylum seeker. 8 U.S.C. § 1158(b)(3)(A); *Miljkovic*

*v. Ashcroft*, 366 F.3d 580, 581-82 (7th Cir. 2004). There is no need to show that the spouse or child faces persecution.

The second form of derivative claim, which is also present in this case, is that if the spouse (or other derivative claimant) is sent back with the primary asylum seeker (Mr. Gatimi, in this case) to their country of origin, she will be subjected to harms that constitute persecution *of him*. (This is to be distinguished from cases in which the persecution of your relative is evidence that the persecutor is gunning for you as well. See *Nyonzele v. INS*, 83 F.3d 975, 983 (8th Cir. 1996); *Arriaga-Barrientos v. INS*, 937 F.2d 411, 414 (9th Cir. 1991).) If your house is burned down, or your child killed, in order to harm you, the fact that you are not touched does not mean that those acts cannot constitute persecution of you. *Abay v. Ashcroft*, 368 F.3d 634, 640-42 (6th Cir. 2004); *In re A-K-*, 24 I. & N. Dec. 275, 278 (BIA 2007); *Tchoukhrova v. Gonzales* 430 F.3d 1222, 1225 n. 2 (9th Cir. 2005) (dissent from denial of rehearing en banc); but see *Mame Fatou Niang v. Gonzales*, 492 F.3d 505, 512 (4th Cir. 2007). Genital mutilation of one's wife, unless one happens to be a supporter of the practice, is a way to punish one, and so the menace to Mrs. Gatimi is a legitimate component of Mr. Gatimi's case. To send her back to Kenya to face female genital mutilation would be to enable persecution of him.

Furthermore, a derivative claimant can advance reasons independent of those of the primary claimant for why she should not be deported. (There is one definite, and one arguable, exception. See *Yu v. U.S. Attorney General*, 568 F.3d 1328, 1332-33 (11th Cir. 2009) (threat of

forced sterilization of derivative claimant spouse cannot support primary claimant's application); *Lin-Zheng v. Attorney General*, 557 F.3d 147, 155-57 (3d Cir. 2009) (en banc) (same); *Shi Liang Lin v. U.S. Dept. of Justice*, 494 F.3d 296, 304-14 (2d Cir. 2007) (en banc) (same); *Tchoukhrova v. Gonzales, supra*, 430 F.3d at 1223 (persecution of derivative claimant child cannot support primary claimant's application); *contra*, *Abay v. Ashcroft, supra*, 368 F.3d at 640-42. Neither exception is applicable to this case.) The Board said there was no evidence that Mrs. Gatimi will be subjected to female genital mutilation if she is returned to Kenya. In fact the only evidence in the record is to the contrary; it is that the Mungiki will track her down and subject her to the procedure and the Kenyan police will not interfere. Besides the affidavits to this effect in the record, see *VM v. Secretary of State for the Home Department* (FGM-risks-Mungiki-Kikuyu/Gikuyu) Kenya CG [2008] UKAIT 00049, ¶¶ 150, 242 (United Kingdom Asylum and Immigration Tribunal 2008); Paul Harris, "Mau Mau Returns to Kenya," *Sydney Morning Herald*, Jan. 17, 2000.

Although she did not file a primary claim of asylum (that is, a claim for asylum based on persecution of her) within the one-year deadline for filing such claims, there is no basis in statute, regulation, or case law for imposing that deadline on a derivative claimant merely because she seeks to bolster her claim by evidence that she too is faced with a threat of persecution. When Mrs. Gatimi first arrived in the United States, her husband was still in Kenya without, so far as appears, intending to seek asylum in the United States, and so she had no reason to seek asylum; she expected to return to Kenya, and did. The

grounds that she would have had for seeking asylum within one year of her arrival in the United States became relevant to her situation only much later, when her husband sought asylum.

The order to remove the petitioners from the United States is vacated and the matter is remanded to the Board of Immigration Appeals for further proceedings consistent with this opinion.

VACATED AND REMANDED.