# United States Court of Appeals
## For the First Circuit

No. 10-2390

GORGONIO SICAJU-DIAZ,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Selya and Lipez,

Circuit Judges.

Martin D. Harris on brief for petitioner.
Tony West, Assistant Attorney General, Civil Division, David Bernal, Assistant Director, Office of Immigration Litigation, and Lindsay Williams Zimliki, Office of Immigration Litigation, Civil Division, Department of Justice, on brief for respondent.

November 10, 2011

BOUDIN, **Circuit Judge**.  Gorgonio Sicaju-Diaz is a citizen of Guatemala; he and his wife and three children (the youngest is 11 and a U.S. citizen, the oldest is 29) live in Rhode Island. Sicaju-Diaz was taken into custody by federal immigration officials over twenty years ago near Brownsville, Texas in June 1991.  The then-responsible agency, the Immigration and Naturalization Service ("INS"), initiated deportation proceedings; three months later he filed an application for asylum.

After Sicaju-Diaz failed to appear for a hearing scheduled for October 1991, the immigration judge ("IJ") issued a deportation order in absentia.  Some ten years later, in December 2001, Sicaju-Diaz filed an application for suspension of deportation.  He then moved to reopen his deportation proceedings, saying that he had never received notice of the 1991 hearing or the resulting decision; an IJ agreed to reopen and a series of hearings ensued between 2004 and 2008.

In June 2006, the IJ ruled that Sicaju-Diaz was ineligible for suspension of deportation.  That form of discretionary relief was available when Sicaju-Diaz entered the United States in 1991 to those who met specified qualifications including seven years of continuous presence in the United States, 8 C.F.R. § 1240.65 (2011).  Suspension relief was supplanted in 1996 by a more restrictive "cancellation of removal" remedy and a stop-time provision that excludes time spent after one has been

served with a notice to appear.[1]  This, for Sicaju-Diaz, had occurred at or near the time he entered the country, which would doom his request for relief.

However, Congress amended the 1996 statute the next year --the 1997 amendment is known as NACARA--to exempt certain groups, ultimately including Guatemalans who met certain conditions, from the more rigorous 1996 amendments.  Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997), amended by Pub. L. No. 105-139, 111 Stat. 2644 (1997).  For NACARA to apply, one necessary condition for Sicaju-Diaz was that he not have been apprehended "at the time of entry." NACARA § 203(a)(1), 111 Stat. at 2197; 8 C.F.R. § 1240.61(a).

In a June 2006 decision, the IJ found that Sicaju-Diaz failed to meet this condition because he had been apprehended on June 22, 1991, while wading across the Rio Grande river to enter the United States.  The IJ also found that a second necessary condition had not been satisfied; but the Board of Immigration Appeals, when it eventually reviewed the final order of removal,

---

[1] Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546.  The IIRIRA replaced the suspension of deportation provisions (previously codified at 8 U.S.C. § 1254 (1994)) with the cancellation of removal provisions.  IIRIRA § 308, 110 Stat. at 3009-615.  The IIRIRA also established a "transitional rule" that applied the stop-time provision to suspension of deportation proceedings initiated prior to IIRIRA's effective date.  IIRIRA § 309(c)(5), 110 Stat. at 3009-627.

explicitly declined to reach that ground and nothing more need be said about it.

In November 2008, the IJ resolved the asylum claim. Sicaju-Diaz, although not alleging past persecution, did claim to have a well founded fear of future persecution if he returned to Guatemala. The IJ agreed, ruling that Sicaju-Diaz was "a member of a particular social group composed of family returning to Guatemala after lengthy residence in the United States perceived as wealthy and, therefore, particularly susceptible to extortionate and/or kidnapping demands."

The government and Sicaju-Diaz both sought review in the Board of Immigration Appeals ("Board"). The government challenged the IJ's grant of asylum relief; Sicaju-Diaz defended the ruling and also challenged the IJ's denial of suspension of deportation, arguing that his petition fell within the safe harbor created by NACARA and that he had met all of the necessary conditions.

In November 2010, the Board overturned the IJ's decision on asylum, ruling that "family returning to Guatemala after a lengthy residence in the United States" was not a social group protected under the asylum statute; it also rejected as not objectively reasonable an alternative ground for asylum urged by Sicaju-Diaz based on a threat against him 20 years before. Last, the Board sustained the IJ's finding that Sicaju-Diaz had been

apprehended at the time of entry and did not qualify under NACARA for suspension relief.

Sicaju-Diaz has now sought review in this court. 8 U.S.C. § 1252(a) (2006). Our review of legal questions is de novo, Mendez-Barrera v. Holder, 602 F.3d 21, 24 (1st Cir. 2010), and agency findings of fact are reviewed under a substantial evidence standard. 8 U.S.C. § 1252(b)(4)(B); Segran v. Mukasey, 511 F.3d 1, 5 (1st Cir. 2007). We begin with the more familiar asylum claim as to which our jurisdiction is undisputed. Two different questions are presented and each requires some further background.

The first arises from the IJ's ruling, reversed on review by the Board, that wealthy individuals returning to Guatemala from a lengthy stay in the United States comprise a social group entitled to asylum where the requisite danger and government connection are shown. Asylum is available where the subject establishes a well-founded fear of persecution based on various protected grounds including race, religion, nationality, political opinion and "membership in a particular social group." 8 U.S.C. §§ 1101(a)(42), 1158. Needless to say, this quoted phrase needs interpretation.

The courts have given deference to the glosses provided by the Board in its decisions. INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999). The Board in turn has stressed--and the courts have employed--such concepts as the immutability of the

-5-

characteristic, the visibility and general recognition of the group, and the extent to which the definition is concrete enough to include or exclude claimants.[2] Here, the Board said that being perceived to be wealthy, regardless of why one is so perceived, did not comprise a social group within the meaning of the statute.

Congress in adopting the asylum provision was concerned with persecution, either instigated or tolerated by the government, centering around fundamental attributes--e.g., race, religion, fundamental political belief--that have, across the world and over centuries, produced refugees. See Arteaga v. Mukasey, 511 F.3d 940, 945-46 (9th Cir. 2007). The social group requirement underscores the concern with group identity as the focus of persecution.

Conceivably, a class of persons identified partly based on comparative wealth could be the subject of persecution on the basis of that status. After the Russian Revolution, "kulaks"--the supposedly wealthy peasant class--were viewed as class enemies to be liquidated on account of their immutable heritage. One court concluded that the educated, landowning class in Colombia is today such a social group. Tapiero de Orejuela v. Gonzales, 423 F.3d 666, 672-73 (7th Cir. 2005). But being part of a landowning class

---

[2]Scatambuli v. Holder, 558 F.3d 53, 59-60 (1st Cir. 2009). See also Larios v. Holder, 608 F.3d 105, 108 (1st Cir. 2010); In re S-E-G-, 24 I. & N. Dec. 579, 588 (BIA 2008); In re Acosta, 19 I. & N. Dec. 211, 233-34 (BIA 1985).

is quite different than happening to be wealthy or perceived to be wealthy because of owning a large house, belonging to a well known family or "returning to Guatemala after a lengthy residence in the United States."

This is so because nothing indicates that in Guatemala individuals perceived to be wealthy are persecuted because they belong to a social class or group. In a poorly policed country, rich and poor are all prey to criminals who care about nothing more than taking it for themselves. Indeed, wealth likely provides some extra protection against crime: the poor and near poor in such countries have less but it can more easily be taken from them. The Board's judgment here was both reasonable and consistent with its past precedent. In re A-M-E & J-G-U-, 24 I. & N. Dec. 69, 75-76 (BIA 2007) (rejecting social group of affluent Guatemalans).

Sicaju-Diaz's alternative argument for asylum is more conventional. Sicaju-Diaz testified he was part of a civilian group organized by the military and designed to counteract police corruption and ineffectiveness. In this capacity, he detained a man named David Diaz who threatened Sicaju-Diaz that he would harm him after his release from custody. His brothers had told him after a trip to Guatemala that David Diaz was now a gang member.

Sicaju-Diaz also testified that he was aware of three members of the same civilian group who were recently killed, one of them by someone whom that member had arrested. He added that the

-7-

police are corrupt and aligned with gangs so they would not provide him with protection. The latest State Department Country Report confirmed a rise had occurred in lynchings of "civil servants or police officials who had taken unpopular actions in either enforcing or failing to enforce the law."

The Board said that ordinarily perils from the exercise of state authority grew out of "the nature of . . . employment" and not group membership. In re Fuentes, 19 I. & N. Dec. 658, 661 (BIA 1988). In any event, the Board concluded that the alleged threat in this case was almost twenty years old--so even if the social group requirement were satisfied and Sicaju-Diaz had a subjective fear of revenge by David Diaz, this fear did not meet the test of objective reasonableness.

The Board's assessment as to the objective basis for any fear was supported by the record. Although the threat need not meet a preponderance standard, Sugiarto v. Holder, 586 F.3d 90, 95 (1st Cir. 2009), here the threat was two decades old and from a single individual in a sizable country. Sicaju-Diaz did not point to any further threat from or contact with David Diaz nor indicate how the assailant who allegedly murdered another auxiliary policeman on account of an arrest had anything to do with Sicaju-Diaz.

The objective-fear issue was not one resolved by the IJ (as it exclusively considered the social group of wealthy

Guatemalans) and Sicaju-Diaz suggests that, in deciding it, the Board was supplanting its own designated fact-finder in violation of its own regulation. 8 C.F.R. § 1003.1(d)(3). However, the proof of objective fear component was part of the petitioner's burden of proof, and the Board is entitled in its review function to conclude that the evidence of record does not meet the legal standard. In re A-S-B-, 24 I. & N. Dec. 493 (BIA 2008).

This brings us to the Board's action in upholding the IJ's denial of suspension of deportation relief. This rested, as we have said, on a determination that Sicaju-Diaz had been apprehended "at the time of entry," NACARA § 203(a)(1), 111 Stat. at 2197; 8 C.F.R. § 1240.61(a)(1). Sicaju-Diaz, while arguing that he complied with another condition that the IJ also found unfulfilled, does not dispute that both conditions must be met.[3]

When the IJ rejected NACARA relief in 2006, he referred specifically to the Border Patrol report dated June 22, 1991, reporting--in the box to record "length of time illegally in U.S."--the phrase "At entry" and explaining below that Sicaju-Diaz had "effected illegal entry into the United States by wading the Rio Grande River." The Board on review also pointed to Sicaju-

---

[3]His brief does suggest that he was surprised by the IJ's attention to the issue but it was Sicaju-Diaz's obligation to establish the predicates to consideration of a NACARA claim; the report describing his apprehension was in the administrative record; and Sicaju-Diaz was free to ask the IJ and the Board for a chance to add evidence before the Board's final decision.

Diaz's own January 6, 2004, affidavit that said "I was arrested upon entry by the Border Patrol on June 22, 1991, at Brownsville, Texas."

On this appeal, Sicaju-Diaz has attached two new affidavits; his own states that he had been in the United States for some days prior to June 22, 1991, and was seeking to fly onward--corroborated, he argues, by his written statement on the original Border Patrol record that "I stayed with my travel ticket." The second affidavit is from a traveling companion asserting she and Sicaju-Diaz entered on or about June 22 together and were arrested inside the United States at the airport.

On appeal, Sicaju-Diaz's brief seems to assume that the statute bars only those apprehended before setting foot on U.S. soil, although one can easily imagine that the purpose of the distinction might call for a somewhat broader reading. In all events, neither of the latter two affidavits was presented to or considered by the Board, so neither is part of the administrative record, and so cannot be considered in this proceeding. 8 U.S.C. § 1252(b)(4)(A).

We have described this evidence not in order to assess it but to confirm that, at best, there is a factual dispute about whether Sicaju-Diaz was caught at entry, in some relatively narrow sense, or at some later time. Although the record evidence supports the Board, the government's front line position is that

-10-

review is barred entirely by a further provision of NACARA reading as follows:

> A determination by the Attorney General as to whether an alien satisfies the requirements of clause (i) [of apprehension at entry, benefits registration, and date of entry] is final and shall not be subject to review by any court.

§ 203(a)(1), 111 Stat. at 2198 (amending IIRIRA § 309(c)(5)) (codified at 8 U.S.C. § 1101 note).

Although we have not addressed the issue in a published opinion, other circuits have applied its straightforward language to bar just the type of claim that Sicaju-Diaz is making on this appeal.[4] Several of these cases carve out from this exclusion questions of constitutional law or perhaps any strictly legal issue, Lanuza v. Holder, 597 F.3d 970, 972 (9th Cir. 2010) (per curiam); Frech v. U.S. Attorney Gen., 491 F.3d 1277, 1281 (11th Cir. 2007), but that qualification would not assist Sicaju-Diaz here.

One unpublished opinion in this circuit did squarely consider and reject on the merits NACARA claims. However, it assumed, rather than examined, jurisdiction, Urizar v. Gonzáles, 247 F. App'x 210, 211-12 (1st Cir. 2007) (per curiam), and so did

---

[4]See Lanuza v. Holder, 597 F.3d 970, 972 (9th Cir. 2010) (per curiam); Cifuentes Ruiz v. Gonzales, 455 F.3d 661, 662 (6th Cir. 2006) (per curiam); Centeno v. U.S. Attorney Gen., 441 F.3d 904, 905 (11th Cir. 2006) (per curiam).

not decide the issue.  In addition, unpublished opinions are not binding circuit precedent.  1st Cir. Local R. 32.1.0(a).

The petition for review is <u>denied</u>.