# United States Court of Appeals
## For the First Circuit

No. 11-1047

ERASMO ROJAS-PÉREZ,
ANGÉLICA GARCÍA-ÁNGELES,

Petitioners,

v.

ERIC H. HOLDER, JR.,
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Howard, and Thompson,
<u>Circuit Judges</u>.

<u>Randy Olen and Robert D. Watt, Jr.</u>, on brief for petitioners.
<u>Sabatino F. Leo</u>, Trial Attorney, Office of Immigration Litigation, Civil Division, <u>Tony West</u>, Assistant Attorney General, and <u>Anthony P. Nicastro</u>, Senior Litigation Counsel, on brief for respondent.

November 5, 2012

**TORRUELLA, Circuit Judge.** Erasmo Rojas-Pérez ("Rojas"), the lead petitioner in this case, and his wife, Angélica García-Ángeles ("García"), seek review of a final order of removal issued by the Board of Immigration Appeals ("BIA") on December 14, 2010. Because we conclude that the BIA's decision was reasonable and adequately supported by substantial evidence, we deny the instant petition for review.

## I. Background

Rojas and García (collectively, the "petitioners") entered the United States without inspection on January 2001 and July 2003, respectively. On November 16, 2004, the government filed a Notice to Appear ("NTA") in immigration court charging Rojas with removability under sections 212(a)(6)(A)(i) and 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1182(a)(6)(A)(i), 1182(a)(7)(A)(i)(I).[1] An NTA charging García with removability under INA § 212(a)(6)(A)(i) followed on September 12, 2006.

The petitioners conceded removability as aliens who had entered the United States without inspection but, on July 18, 2007, filed applications for withholding of removal under INA

---

[1] Section 212(a)(6)(A)(i) of the INA, codified at 8 U.S.C. § 1182(a)(6)(A)(i), renders "alien[s] present in the United States without being admitted or paroled" inadmissible to the United States. Section 212(a)(7)(A)(i)(I) of the INA, codified at 8 U.S.C. § 1182(a)(7)(A)(i)(I), prescribes the same for aliens who lack valid identification at the time they file an application for admission into the United States.

§ 241(b)(3), 8 U.S.C. § 1231(b)(3). Rojas and García each grounded their individual requests for relief on their stated belief that if the family returned to Mexico, their son Iker Rojas -- a U.S. citizen by virtue of being born in the United States in 2006 -- could be kidnapped and held for ransom.

A hearing on the merits of the petitioners' applications was held before an immigration judge ("IJ") on February 6, 2009. At the hearing, Rojas testified that he and García feared returning to Mexico because "people" would know that the family had been in, and returned from, the United States and this made it likely that his son could be kidnapped and held for ransom. Rojas added that he feared his son could be kidnapped by criminal gangs or "the police itself," but denied having received any specific threats to that effect. Rojas also explained that neither he nor his wife's family had been subjected to attacks while in Mexico. García limited her testimony to brief remarks in which she admitted that she entered the United States without inspection in 2003 and affirmed that she was Rojas's spouse.

The IJ denied the petitioners' applications for withholding of removal on the same day as the merits hearing. The IJ found Rojas's and García's testimonies credible, but nonetheless concluded that they had not shown it was "more likely than not that they would be persecuted upon their return to Mexico on account of a statutorily protected ground." Speaking specifically to Rojas's

-3-

claims that he feared his family would be targeted on account of their sojourn in the United States, the IJ reasoned that persons "returning from the United States and who may be looked upon as having money . . . do not comprise a particular social group" for withholding of removal relief.

The petitioners appealed the IJ's findings and, on December 14, 2010, the BIA affirmed the IJ's ruling. In its written order, the BIA defined the petitioners' purported social group as "persons who have a lengthy residence in the United States and are parents" of U.S. citizen offspring. The BIA reasoned that the petitioners' stated fear that their son could be kidnapped and held for ransom upon returning to Mexico was not properly grounded in their belonging to a discernible social group. To support its reasoning, the BIA cited to its own precedent for the proposition that "fear of persecution based on perceived wealth does not constitute a particular social group under the [INA]." Rojas then filed a timely petition for review with this court.

## II. Discussion

This court has jurisdiction to review BIA-issued final removal orders under 8 U.S.C. § 1252(a). In circumstances such as the present case, where the "BIA adopts an IJ's decision but opts to offer a glimpse into its considerations, we review both the decision of the BIA and the IJ." Restrepo v. Holder, 676 F.3d 10, 15 (1st Cir. 2012). Under the applicable "substantial evidence"

-4-

standard, we yield to the IJ's findings of fact "so long as they are 'supported by reasonable, substantial and probative evidence on the record considered as a whole.'" Cheung v. Holder, 678 F.3d 66, 69 (1st Cir. 2012) (quoting Seng v. Holder, 584 F.3d 13, 17 (1st Cir. 2009)). Questions of law, however, are afforded de novo consideration, albeit with proper deference to the agency's interpretation of the applicable statutes and regulations. See Lobo v. Holder, 684 F.3d 11, 16 (1st Cir. 2012); McCreath v. Holder, 573 F.3d 38, 41 (1st Cir. 2009).

Under INA § 241(b)(3), withholding of removal relief must issue if the "Attorney General decides that the alien's life or freedom would be threatened in [the destination country] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). An alien applying for such relief bears the burden of proof and must establish either of two showings: that he has "suffered past persecution"[2] -- thus creating a rebuttable presumption of likely future persecution -- or, that if returned to his country of origin, "it is more likely than not that he . . . would be persecuted" on account of the above-referenced factors. 8 C.F.R. § 208.16(b)(2). To establish either of these showings, an alien must show a "clear probability" of future persecution once

---

[2] Consistent with Rojas's admission that he was never harmed while he resided in Mexico, the IJ found that the petitioners had not suffered past persecution.

-5-

repatriated. INS v. Stevic, 467 U.S. 407, 413 (1984); see also Rashad v. Mukasey, 554 F.3d 1, 5-6 (1st Cir. 2009).

Because the INA does not define the phrase "particular social group," we have deferred to the BIA's interpretation of the term. See Mayorga-Vidal v. Holder, 675 F.3d 9, 14 (1st Cir. 2012); Méndez-Barrera v. Holder, 602 F.3d 21, 25-26 (1st Cir. 2010). Accordingly, we have recognized in this context that a legally "cognizable social group is one whose members share 'a common, immutable characteristic that makes the group socially visible and sufficiently particular.'" Carvalho-Frois v. Holder, 667 F.3d 69, 73 (1st Cir. 2012) (quoting Méndez-Barrera, 602 F.3d at 25).

We find that substantial evidence supports the agency's conclusion that Rojas failed to show that if the petitioners were to return to Mexico, it is more likely than not that they would be persecuted because they belong to a particular social group. Specifically, Rojas alleges that he and García face persecution if they return to Mexico because they belong to a particular social group comprised of "persons who have lengthy residence in the United States and are parents of a United States citizen." As the IJ and the BIA both explained, the reasoning behind this argument appears to be that individuals returning from the United States would possibly be looked upon by criminals as being more financially well-off than others and would thus be targeted for

harm -- here, by the kidnapping and ransoming of their son who is a U.S. citizen.

Both this court and the BIA have rejected calls to recognize individuals who might be perceived as being wealthy or as "having money" and are returning to their country of origin after living in the United States as legally cognizable social groups. See Sicajú-Díaz v. Holder, 663 F.3d 1, 3-4 (1st Cir. 2011) (rejecting class comprised of "wealthy individuals returning to Guatemala after a lengthy residence in the United States"); López-Castro v. Holder, 577 F.3d 49, 54 (1st Cir. 2009) (rejecting argument that petitioner "would be exposed to an increased risk of future attacks by gang members in Guatemala because he [would] be perceived as wealthy"); see also Díaz v. Holder, 459 F. App'x 4, 6 (1st Cir. 2012); In re A-M-E & J-G-U-, 24 I. & N. Dec. 69, 75-76 (BIA 2007); In re S-V-, 22 I. & N. Dec. 1306, 1310 (BIA 2000), overruled on other grounds by Zheng v. Ashcroft, 332 F.3d 1186 (9th Cir. 2003). The reasoning underpinning these holdings is that, when a petitioner asserts that, upon repatriation, he would be persecuted on account of his perceived wealth or financial status, "[t]hat suggestion fails to establish an objectively reasonable basis for a fear of persecution premised on a statutorily protected ground." López-Castro, 577 F.3d at 54. Put another way, a petitioner pressing such a contention does not advance an argument that he would be persecuted because of membership in a particular

social group -- "[a] country-wide risk of victimization through economic terrorism is not the functional equivalent of a statutorily protected ground . . . ." Id.

In denying Rojas's application for withholding of removal and affirming that decision, both the IJ and the BIA (respectively) grounded their analyses on this well-settled logic. For his part, the IJ referenced BIA precedent for the proposition that "those who are returning from the United States and who may be looked upon as having money and therefore are fearful of being targets do not comprise a particular social group." In its opinion, the BIA then reiterated the IJ's reasoning and cited several of its decisions endorsing the same rationale. We accordingly find the agency's judgment here to have been both reasonable and consonant with its precedent.[3]

---

[3] Although Rojas claims that the BIA incorrectly focused on the "persecution based on wealth" logic at the expense of paying attention to the importance of the specific harm that the petitioners allege could befall them in Mexico -- i.e., the kidnapping and ransoming of their son, a U.S. citizen -- we do not find that to be the case. To the extent that Rojas and García state that they are fearful that their son would be kidnapped if the family returns to Mexico, they admit that any such fear follows from their belief that they would be perceived by others as wealthy once there, thus making their son an attractive target for abduction. All this means is that the possibility that their son would be kidnapped by criminal gangs or rogue police officers is the kind of "persecution" that they fear they would suffer once in Mexico. But as our above discussion and precedent suggest, "hostile treatment based on economic considerations is not persecution." López-Castro, 577 F.3d at 54.

In an attempt to outflank the considerable amount of case law supporting the agency's decision, Rojas advances a secondary and potentially more consequential argument. Specifically, Rojas takes issue with the BIA's reliance on "social visibility" as one of the requisite factors that would define a particular and legally cognizable social group under BIA precedent. This requirement, which the BIA incorporated into its analysis of what comprises a "particular social group" in 2006, see In re C-A-, 23 I. & N. Dec. 957 (BIA 2006), demands that the "common, immutable characteristic" that an asserted group shares must also "make the group [] generally recognizable in the community," Faye v. Holder, 580 F.3d 37, 41 (1st Cir. 2009).

The social visibility requirement undergirds the cases on which the agency relied in denying the petitioners' applications for withholding. Both this court and the BIA have generally reasoned that petitioners claiming that they belong to a particular social group comprised of persons who are either wealthy or would be perceived as such upon their return to a country where crime is endemic do not meet the social visibility requirement. Because crime affects all who reside in those countries, the logic goes, wealth (or the perception of wealth) would not necessarily single out a person for victimization. See Sicajú-Díaz, 663 F.3d at 4 ("In a poorly policed country, rich and poor are all prey to criminals who care about nothing more than taking it for

-9-

themselves."); In re A-M-E & J-G-U-, 24 I. & N. Dec. at 74 ("[T]here is little in the background evidence of record to indicate that wealthy Guatemalans would be recognized as a group that is at greater risk of crime in general or of extortion or robbery in particular.").

The reasoning behind the BIA's social visibility requirement has come in for some criticism of late, and Rojas points to varied authority in calling this court to recognize that the requirement is both unwarranted and unnecessary. The sharpest critique of the social visibility requirement that Rojas points to is the Seventh Circuit's decision in Gatimi v. Holder, 578 F.3d 611 (7th Cir. 2009), in which that court invalidated the BIA's social visibility requirement in the asylum context. The Gatimi court acknowledged the above-stated proposition that the BIA's definition of the statutory phrase "particular social group" is entitled to deference, see id. at 615, but nonetheless explained that, in its estimation, the BIA's application of the social visibility requirement was both unreasonable and inconsistent. First, the Gatimi court stated that the social visibility requirement "ma[de] no sense," adding:

> nor has the [BIA] attempted . . . to explain
> the reasoning behind the criterion of social
> visibility. Women who have not yet undergone
> female genital mutilation in tribes that
> practice it do not look different from anyone
> else. A homosexual in a homophobic society
> will pass as heterosexual. If you are a
> member of a group that has been targeted for

assassination or torture or some other mode of persecution, you will take pains to avoid being socially visible; and to the extent that members of the target group are successful in remaining invisible, they will not be "seen" by other people in the society "as a segment of the population."

Id. Further advancing its reasoning, the Gatimi court noted that it found the deference that is commonly due to the BIA's definition of "particular social group" unwarranted in the context of the social visibility requirement. Here, the Seventh Circuit explained that it considered the BIA to have been "inconsistent" in applying the requirement, "[finding] groups to be 'particular social groups' without reference to social visibility . . . as well as, in . . . other cases, refusing to classify socially invisible groups as particular social groups but without repudiating the other line of cases." Id. at 615-16. The court thus found that, regarding social visibility as a criterion for determining a "particular social group,"

the Board has been inconsistent rather than silent. . . . When an administrative agency's decisions are inconsistent, a court cannot pick one of the inconsistent lines and defer to that one, unless only one is within the scope of the agency's discretion to interpret the statutes it enforces or to make policy as Congress's delegate. Such picking and choosing would condone arbitrariness and usurp the agency's responsibilities.

Id. at 615-16 (citations omitted).

Only one of the other federal circuit courts of appeal has endorsed the Gatimi court's reasoning. In its judgment in

-11-

Valdiviezo-Galdamez v. Att'y Gen. of the United States, 663 F.3d 582 (3d Cir. 2011),[4] the Third Circuit voiced similar concerns regarding what it perceived as a lack of consistency in the BIA's application of its own requirement. For example, the Valdiviezo-Galdamez court noted that the BIA had, since first interpreting the statutory phrase "particular social group" in 1985, see In re Acosta, 19 I. & N. Dec. 211 (BIA 1985), overruled on other grounds by In re Mogharrabi, 19 I. & N. Dec. 439 (BIA 1987), "recognized a number of groups as 'particular social groups' where there was no indication that the group's members possessed 'characteristics that were highly visible and recognizable by others in the country in question' or possessed characteristics that were otherwise 'socially visible' or recognizable," Valdiviezo-Galdamez, 663 F.3d at 604. By way of example, the Valdiviezo-Galdamez court added:

> [T]he BIA has found each of the following groups to constitute a "particular social group" for purposes of refugee status: women who are opposed to female genital mutilation (Matter of Kasinga), homosexuals required to register in Cuba, (Matter of Toboso-Alfonso), and former members of the El Salvador national police (Matter of Fuentes). Yet, neither anything in the Board's opinions in those cases nor a general understanding of any of those groups, suggests that the members of the groups are "socially visible." The members of each of these groups have characteristics which are completely internal to the

---

[4]  Rojas does not rely upon Valdiviezo-Galdamez in his briefing before this Court. The Valdiviezo-Galdamez decision was issued on November 8, 2011, one day after his brief was filed in the instant matter.

-12-

individual and cannot be observed or known by other members of the society in question (or even other members of the group) unless and until the individual member chooses to make that characteristic known.

Id. Based on the fact that the above-cited particular social groups would not be cognizable if the BIA were to impose the "social visibility" requirement today, the court found the requirement inconsistent with past BIA decisions and concluded that "it is an unreasonable addition to the requirements for establishing refugee status where that status turns upon persecution on account of membership in a particular social group." Id. The court went further in finding that the BIA's particularity requirement was inconsistent with prior decisions, stating that it was "hard-pressed to discern any difference between the requirement of 'particularity' and the discredited requirement of 'social visibility.'" Id. at 608.

While this Court recognizes the cogency and persuasiveness of both the reasoning and the outcomes of the Seventh and Third Circuits' decisions, it is bound by its own precedent regarding the reasonableness of the BIA's social visibility requirement.[5] See Beltrand-Alas v. Holder, No. 11-1419,

---

[5] The Court rejects, however, the concurrence's statement that we have "on multiple occasions addressed the viability of the social visibility criterion, and rejected the very arguments by which the majority has been persuaded here." This is not the case. The Court has only addressed the arguments of inconsistency as stated in the Gatimi opinion in Beltrand-Alas. In its prior decisions, the Court in no way referenced arguments challenging as

-13-

2012 U.S. App. LEXIS 17378, at * 9 (1st Cir. Aug. 17, 2012). A panel decision may only be overturned where it is either undermined by "subsequently announced controlling authority" or in the rare instance where "authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind." Mongeau v. City of Marlborough, 492 F.3d 14, 18-19 (1st Cir. 2007)(quoting Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995)). Since no controlling authority has been announced subsequent to this Court's decision in Beltrand-Alas, and since this Court just reviewed in that decision the same arguments Petitioner presents here regarding the inconsistency and unreasonableness of the BIA's "social

---

inconsistent and arbitrary the BIA's application of the social visibility requirement. See, e.g., Faye, 580 F.3d at 41 (only stating generally that the Court "show[s] some deference to the BIA's interpretation of the term ['social group']" without evaluating the reasonableness per se of its extrapolation from the immutability requirement that a characteristic be "socially visible"); Méndez-Barrera, 602 F.3d at 25-26 (in stating that "we have found th[e] elaboration [of the social visibility requirement] to be not only reasonable but also within the BIA's purview," conflating the deference granted to the BIA's interpretations of "social group" in prior decisions (Scatambuli and Faye) with the Court's granting of deference to the BIA's delineation of the social visibility requirement). In fact, the Court has even avoided addressing head on the issue of a tension between the immutability requirement and the social visibility requirement. See Scatambuli, 558 F.3d at 60 ("it is not necessary in this case for us to explore whether there is any tension between looking to the visibility of a particular social group and the requirement that members of a group share an immutable or fundamental characteristic.").

-14-

visibility" requirement, the only fresh development for the Court to consider is the further divergence in the circuit courts resulting from the Third Circuit decision in Valdiviezo-Galdamez. Since that decision is based on similar reasoning as the Seventh Circuit's decision, it is difficult to categorize the Third Circuit's iteration as a fresh development the panel had not already considered, and that would be sufficient to change its collective mind.

The Court nevertheless believes that the requirement of social visibility at the very least merits additional examination by and clarification from the BIA. It is particularly unclear how courts are to square the BIA's more recent statements regarding the social visibility requirement with its former decisions, which allow as cognizable those characteristics in particular social groups that are only visible when made known by individual members, cf. In re Kasinga, 21 I. & N. Dec. 357, 365-66 (BIA 1996) and In re Toboso-Alfonso, 20 I. & N. Dec. 819, 822-23 (BIA 1990). Also, if an "immutable" characteristic is one that an individual possesses but either cannot change or should not be required to change, it is not clear why an individual with a hidden characteristic need make that characteristic known for it to be deemed immutable. See, e.g., In re Acosta, 19 I. & N. Dec. at 49-50.

The concurrence states that criticisms of the BIA's application of the social visibility requirement need not be

-15-

entertained in this case. We wholeheartedly disagree for two reasons. First, the criticisms were explicitly raised by the Petitioner in his Gatimi-based challenges to the social visibility requirement, and we find it appropriate to address those challenges on that basis and on the basis of the growing circuit split on the issue. Second, as the Gatimi court has stated, "[w]hen an administrative agency's decisions are inconsistent, a court cannot pick one of the inconsistent lines and defer to that one . . . . [s]uch picking and choosing would condone arbitrariness and usurp the agency's responsibilities." Gatimi, 578 F.3d at 616 (citations omitted).

This Court's own "application of the social visibility test," however reasonable and broad, is not the target of Petitioner's challenge. Rather, Petitioner challenges, as he may after Chevron, the BIA's inconsistently applied interpretation of the immutability requirement as encompassing a socially visible characteristic to which the Court has granted deference. It is therefore unavailing that this Court has adopted a more or less demanding approach to this or any other term in the INA. See, e.g., Negusie v. Holder, 555 U.S. 511, 523 (2009) ("ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps . . . involves difficult policy choices that agencies are better equipped to make than

-16-

courts.") (citation and quotation marks omitted); <u>Nat'l Cable & Telecomms. Ass'n</u> v. <u>Brand X Internet Servs.</u>, 545 U.S. 967, 985 (2005) ("Before a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's the court must hold that the statute unambiguously requires the court's construction."). The Court cannot be concerned about the fact that its jurisprudence, as the concurrence states, "does not <u>necessarily</u> exclude groups whose members might have some measure of success in hiding their status in an attempt to escape persecution." (Emphasis added). Rather, the Court is and should be solely concerned with whether the <u>BIA's</u> social visibility requirement so excludes such groups in its inconsistent interpretation and application of the INA.[6]  <u>See</u>, <u>e.g.</u>, <u>Chevron, U.S.A., Inc.</u> v. <u>NRDC, Inc.</u>, 467 U.S. 837, 843 (1984) ("If . . . the court determines Congress has not directly addressed the precise question at issue, the court does

---

[6]  The concurrence's citation to the Tenth Circuit's decision in <u>Rivera-Barrientos</u> v. <u>Holder</u> fails to address this concern.  <u>See</u> <u>Rivera-Barrientos</u>, 666 F.3d 641 (10th Cir. 2012).  The concurrence quotes the court's statement that, "social visibility requires that the relevant trait be potentially identifiable by members of the community, either because it is evident or because the information defining the characteristic is publically accessible."  <u>See</u> <u>id.</u> at 652.  This statement by the Tenth Circuit is not helpful here as it fails to explain how homosexuals or females who fear genital mutilation, groups which have been accorded protection by the BIA, have characteristics that are either "evident" or "publicly accessible."  The Tenth Circuit appears to further solidify a tendency by the circuit courts to establish their own standards of what the social visibility requirement consists of, even if that standard conflicts with the BIA's prior rulings on protected social groups.

not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to a specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

On this basis, the Court cannot share the concurrence's concern that our discussion of this issue may encourage "misplaced challenges to the BIA's social visibility requirement." First, it is both the duty and mandate of this Court to review the BIA's interpretation and application of the INA over time precisely to evaluate whether its rule is arbitrary or capricious. See, e.g., Mayo Found. for Med. Educ. & Research v. United States, 131 S. Ct. 704, 711-12 (2011). Second, while it is true and this Court has acknowledged that we are bound by our own precedent, it is not our task to operate blindly and unscientifically in the face of legitimate challenges to either our prior rulings or the adjudications of an administrative agency tasked with interpreting its organic statute.

### III.  Conclusion

In any event, since this Court does not write on a clean slate, and since the BIA's determinations were based on substantial evidence in the record before it, the Court must deny Rojas-Pérez's petition for review.

**-- Concurring opinion follows --**

-18-

**HOWARD, Circuit Judge (concurring).** While I concur in the judgment, I do not endorse the court's critiques of the social visibility test, which we have recently and unreservedly rejected, see, e.g., Beltrand-Alas v. Holder, 689 F.3d 90, 93 (1st Cir. 2012). Nor can I discern any reason to entertain such criticisms anew, given that they have no impact on the outcome in this case. Thus, I decline to join the majority's dicta on this nonessential matter.

## I.

The validity of the BIA's social visibility test is not an issue of first impression in this circuit. We have on multiple occasions addressed the viability of the social visibility criterion, and rejected the very arguments by which the majority has been persuaded here. See, e.g., id. ("[The petitioner] argues that . . . the BIA's use of 'social visibility' in the social group analysis is an arbitrary and capricious interpretation of the statute . . . [but] this court has held that the social visibility criterion is reasonable because it represents an elaboration of how the requirement operates and is an interpretation of an ambiguous statutory term.") (internal quotation marks omitted); Mendez-Barrera v. Holder, 602 F.3d 21, 26 (1st Cir. 2010) ("[T]he petitioner asserts that we should ignore [the BIA's delineation of the term 'social group'] because . . . the BIA departed from precedent, gutted its immutable characteristic test, and

-19-

substituted a new (and unprecedented) social visibility test.  This assertion contains more cry than wool . . . .  The social visibility criterion . . . represents an elaboration of how [the immutable characteristic] requirement operates.  We have found this elaboration to be not only reasonable but also within the BIA's purview."); Scatambuli v. Holder, 558 F.3d 53, 59-60 (1st Cir. 2009) (examining the contours of the BIA's social visibility test and finding that "it is relevant to the particular social group analysis").

We are not alone in this view.  A multitude of other circuits have similarly concluded that the BIA's interpretation of "social visibility" is reasonable and therefore entitled to Chevron deference.  See Orellana-Monson v. Holder, 685 F.3d 511, 519-20 (5th Cir. 2012); Rivera-Barrientos v. Holder, 666 F.3d 641, 648 (10th Cir. 2012); Al-Ghorbani v. Holder, 585 F.3d 980, 991, 994 (6th Cir. 2009); Ramos-Lopez v. Holder, 563 F.3d 855, 858-62 (9th Cir. 2009); Davila-Mejia v. Mukasey, 531 F.3d 624, 628-29 (8th Cir. 2008); Ucelo-Gomez v. Mukasey, 509 F.3d 70, 73-74 (2d Cir. 2007) (per curiam); Castillo-Arias v. U.S. Att'y Gen., 446 F.3d 1190, 1197-98 (11th Cir. 2006).

Only the Third and Seventh Circuits have expressly declined to apply the BIA's framework.  See Valdiviezo-Galdamez v. Att'y Gen., 663 F.3d 582, 603-09 (3d Cir. 2011); Gatimi v. Holder, 578 F.3d 611, 615-17 (7th Cir. 2009).  The majority aptly sets

forth the reasoning of those courts, and I need not belabor the point here.  At bottom, they have narrowly construed "social visibility," as applied by the BIA, to mean that "you can be a member of a particular social group only if a complete stranger could identify you as a member if he encountered you in the street, because of your appearance, gait, speech pattern, behavior or other discernible characteristic."  Ramos v. Holder, 589 F.3d 426, 430 (7th Cir. 2009); see also Valdiviezo-Galdamez, 663 F.3d at 603-09.  Consequently, they rejected the test after concluding that this "immediate identifiability" requirement was inconsistent with a line of unrepudiated BIA cases finding social groups based on physical traits that are generally "invisible."  See id.

I see no need to interpret social visibility so narrowly.  The seminal BIA decision establishing the test, Matter of C-A-, recognized numerous traits as socially visible that are not immediately apparent to the naked eye, including opposition to genital mutilation, kinship ties, and prior employment as a police officer.  See 23 I. & N. Dec. 951, 959-61 (BIA 2006).  As the Tenth Circuit has succinctly explained,

> if opposition to genital mutilation, kinship ties, and prior employment as a police officer are socially visible, social visibility cannot be read literally.  Rather, social visibility requires that the relevant trait be potentially identifiable by members of the community, either because it is evident or because the information defining the characteristic is publically accessible.

-21-

<u>Rivera-Barrientos</u>, 658 F.3d at 652.

Our application of the social visibility test comports with that understanding:  social visibility does not demand that the relevant trait be externally visible or otherwise immediately identifiable.  We have held that to satisfy the social visibility test, a group need only "be generally recognized in the community as . . . cohesive."  <u>Mendez-Barrera</u>, 602 F.3d at 26.  The term "recognized" should not be conflated with the <u>physical</u> visibility of the targeted immutable characteristic; it is not an "eyeball" test.  <u>See id.</u>  Thus, it matters not whether, as stated in <u>Valdiviezo-Galdamez</u>, the trait is "completely internal to the individual and cannot be observed or known by other members of the society in question . . . unless and until the individual member chooses to make that characteristic known," 663 F.3d at 604; rather, we consider only whether, if that characteristic <u>were</u> known, those who exhibit it -- regardless of its visibility to the casual passerby -- comprise a group that would be identified by their society as sufficiently cohesive.  <u>See</u> <u>Mendez-Barrera</u>, 602 F.3d at 26 ("The relevant inquiry is whether the social group is visible in the society, not whether the alien herself is visible to the alleged persecutors.");  <u>Faye</u> v. <u>Holder</u>, 580 F.3d 37, 41-42 (1st Cir. 2009) (finding that the petitioner's proposed social group of "adulterers who had a child out of wedlock" was not socially visible, not due to the absence of some externally visible trait,

but because the petitioner "did not explain how Senegalese society generally would perceive her and women in a similar position"). Accordingly, the social visibility requirement -- as both the BIA and this circuit have applied it -- does not necessarily exclude groups whose members might have some measure of success in hiding their status in an attempt to escape persecution.[7]

## II.

Even assuming for argument's sake that the social visibility test has been inconsistently or unreasonably interpreted by the BIA, this petitioner's claim fails. The social group that he proposes -- "persons who have lengthy residence in the United States and are parents of a United States citizen" -- is merely a particularized description of "perceived wealth," a trait which the BIA and several courts of appeals, including the Third and Seventh Circuits, rejected as an immutable characteristic long before the social visibility test was ever formulated. See, e.g., Tapiero De

---

[7] There is a class of cases in which the conduct of a petitioner, due to its clandestine or confidential nature, was deemed insufficiently visible. See, e.g., Scatambuli v. Holder, 558 F.3d 53, 60 (1st Cir. 2009) (rejecting "informants" as a particular social group because "the universe of those who knew of the petitioners' identity as informants was quite small; the petitioners were not particularly visible"); Matter of C-A-, 23 I. & N. Dec. 951, 960 (BIA 2006) (rejecting "confidential informants" as a particular social group on the basis that members are "generally out of the public view"). It makes sense that such individuals, who act in secrecy with no definable common group goal would not be thought to be members of a sufficiently cohesive group. Those cases do not stand for the proposition that an immutable characteristic must be externally or immediately ascertainable to meet the social visibility standard.

Orejuela v. Gonzales, 423 F.3d 666, 672 (7th Cir. 2005); Jimenez-Mora v. Ashcroft, 86 Fed. App'x. 527, 531 (3d Cir. 2004); Matter of S-V-, 22 I. & N. Dec. 1306, 1310 (BIA 2000) (holding that actions motivated by "perceived wealth" were insufficient, without more, to support a finding of persecution based on membership in a particular social group), overruled on other grounds by Zheng v. Ashcroft, 332 F.3d 1186 (9th Cir. 2003); Matter of V-T-S-, 21 I. & N. Dec. 792, 799 (BIA 1997) (same).  In other words, removing the social visibility test from the equation would not salvage the petitioner's case, obviating any need to reconsider this circuit's well-settled precedent.

## III.

In the end, my concern is that the dicta in the majority opinion may encourage what I believe will be misplaced challenges to the BIA's social visibility requirement.  We have repeatedly found that requirement to be sound, and the majority's discussion is not a reflection, institutionally, of the view of this court.